JONES DAY

Bruce Bennett (*pro hac vice* admission pending*)*)
Christopher Lovrien (*pro hac vice* admission pending)
Michael McCauley (*pro hac vice* admission pending)
555 South Flower Street, Fiftieth Floor
Los Angeles, CA  90071-2300
Telephone:    (213) 489-3939
Facsimile:    (213) 243-2539

Lee Armstrong
222 East 41st Street
New York, NY 10017-6702
Telephone:    (212) 326-3939
Facsimile:    (212) 755-7306

MORRISON & FOERSTER LLP

Adam S. Hoffinger
Daniel A. Nathan
2000 Pennsylvania Ave., NW
Washington, DC 20006-1888
Telephone:    (202) 887-1500
Facsimile:    (202) 887-0763

Brett H. Miller
1290 Avenue of the Americas
New York, NY 10140-0050
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900

*Attorneys for the Litigation Trustee*
*of the MF Global Litigation Trust*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- x

| | |
|---|---|
| In re | Chapter 11 |
| MF GLOBAL HOLDINGS LTD., *et al.*, | Case No. 11-15059 (MG) |
| Debtors. | (Jointly Administered) |
| NADER TAVAKOLI, AS LITIGATION TRUSTE OF THE MF GLOBAL LITIGATION TRUST, | |
| Plaintiff, | Adv. Pro. No. 13-01333 (MG) |
| v. | |
| JON S. CORZINE, BRADLEY I. ABELOW, AND HENRI J. STEENKAMP, | |
| Defendants. | |

------------------------------------------------------- x

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

## INTRODUCTION

1.      This case involves serious and repeated breaches of fiduciary duties by former

high-ranking officers of MF Global Holdings Ltd. that caused the Company's business to

collapse and the bankruptcy of the debtors.[1]  MF Global's bankruptcy can be traced to a scheme

Defendants Jon S. Corzine ("Corzine"), MF Global's former Chairman and Chief Executive

Officer;  Bradley I. Abelow ("Abelow"), MF Global's former Chief Operating Officer,

Executive Vice President, and President; and Henri J. Steenkamp ("Steenkamp"), MF Global's

Chief Financial Officer (collectively, the "Defendants") designed and implemented to prop-up

the Company's apparent profitability through highly-leveraged transactions in foreign debt.  This

scheme strained the Company's liquidity, so much so that Defendants ultimately and wrongly

plunged into segregated customer accounts and used customer funds to cover debts related to

their scheme.  Nader Tavakoli, as the Litigation Trustee of the MF Global Litigation Trust,

brings this action against Defendants, in their capacities as officers for the Company, for their

repeated breaches of their fiduciary duties of care and loyalty to the Company.[2]

2.      Shortly after the Defendants took control of the Company, the Defendants

masterminded a scheme that dramatically changed MF Global's historical direction and put MF

Global on a high-risk path that would devastate the Company's liquidity, deplete customer funds,

and ultimately cause the failure of the Company.  Broadly stated, this new path involved the

---

[1] MF Global Holdings Ltd. ("Holdings Ltd."), MF Global Finance USA, Inc. ("FinCo"),
MF Global Capital LLC ("Capital"), MF Global FX Clear LLC ("FX Clear"), MF Global Market
Services LLC ("Market Services"), and MF Global Holdings USA Inc. (individually, "Holdings
USA," and collectively with Holdings Ltd., FinCo, Capital, FX Clear and Market Services, the
"Debtors," and together with their affiliates and subsidiaries wherever located, "MF Global" or
the "Company").

[2] Nader Tavakoli, as the Litigation Trustee, is the assignee of all right, title, and interests
of the Debtors to the Trust Assets, including, but not limited to, the claims asserted in the
complaint Louis J. Freeh, who was the Chapter 11 Trustee for the Debtors, filed against
Defendants.

1

Company making highly leveraged investments in European sovereign debt instruments using repurchase-to-maturity financing transactions, also known as "repo-to-maturity" or "Euro RTM" transactions. These Euro RTM transactions allowed the Company to inflate its earnings by immediately booking income by selling financed debt instruments while incurring significant future liabilities relating to those instruments. Although the Euro RTM transactions were fully financed, the clearinghouses required a payment of margin in the form of cash or other acceptable collateral at the time the transaction was executed. As conditions changed, additional margin could be required, and under stressed financial conditions the margin demands could and did increase significantly. Defendants knew or should have known that the Euro RTM transactions were extremely volatile, particularly in the European countries in which Corzine was investing (e.g., Portugal, Ireland, Italy, Spain), which were known to be among the riskiest of all. Given the lack of information and controls at the Company to manage the significant risks associated with the Euro RTM transactions, Defendants were putting the Company in further peril with each RTM trade they made.

3.      Defendants perceived this plan as important, in part, to fulfill Corzine's representation to the market that he would return the Company to profitability in four to six quarters. Indeed, the Defendants increased the activity in Euro RTM transactions at the close of quarters for this very reason, but there was no legitimate business justification for placing these trades at the end of fiscal quarters. Rather, the increased Euro RTM activity at the end of quarters was designed to inflate quarterly earnings and prop up the Company's stock price.

4.      Defendants increased the amount of Euro RTM trades for the Company to a point that led to liquidity demands that the Company simply could not satisfy, leading to the financial ruin of the Company. Defendants' high-risk revenue scheme resulted in billions of dollars in

Euro RTM transactions.  For example, the Company's Euro RTM positions increased from less than $400 million in mid-September 2010 to close to an $8.3 billion net position at the end of August 2011.  When the underlying European sovereign bonds were downgraded starting in the spring of 2011, the clearinghouses imposed steadily increasing margin calls on MF Global.  The Defendants never adequately assessed the risk that the clearinghouses would demand increased margin on the Euro RTM positions or that the Company would be unable to meet its obligations.  Corzine's outsized European sovereign investments finally caught the attention of at least one regulator of MF Global Inc. ("MFGI"), the Financial Industry Regulatory Authority ("FINRA").  FINRA required MFGI to commit additional capital during the summer of 2011, further stressing the Company's already precarious liquidity position the Defendants caused.

5.     When the inevitable liquidity crises occurred as a result of these transactions, Defendants, recklessly and with gross negligence, violated the law by using segregated customer funds to cover the Company's resulting liabilities.  Corzine was instrumental in misusing these customer funds.  Corzine instructed a Treasury Department employee to take certain positions even if it meant "go[ing] negative" in customer accounts.  His actions prompted the Company's Global Treasurer to tell a colleague "enough is enough. . . . We need to take the keys away from [Corzine]."  Similarly, in October 2011, Corzine directed a subordinate to violate Company policy and draw cash from the regulatory buffer established to ensure the safety of customer funds if cash was needed (rather than draw on the Company's revolving credit facility, which would reveal the deteriorating financial position of the Company).  The Defendants violated this Company policy several times.  Defendants' use of segregated customer funds to avoid the consequences of their repeated breaches of fiduciary duty is itself a breach of Defendants' duty of care and loyalty, which exposed MF Global to significant litigation and liability.  This was

3

reportedly the first time in history that a shortfall in customer segregated funds occurred as a result of such an improper handling of customer funds, and the first time in history that a customer suffered a loss as a result of such improper handling of customer funds.

6.       Defendants knew—as any reasonable business person would—that this high-risk path made it critical they be informed about the Company's available liquidity, ensure the Company's reporting systems and controls were well-equipped to handle the risks this new path presented, and be informed about the other elements important to their scheme.  Yet Defendants were not reasonably informed about, among other things, the Company's available liquidity; failed to establish and maintain information and reporting systems to provide themselves, senior management, and the Board of Directors with critical information that was necessary for Defendants to execute their plan, despite being warned to do so by both internal and external sources; and failed to address the Company's existing and notoriously systemic weaknesses. Defendants' creation and implementation of their "earnings now" scheme were not strategic choices but decisions that were uninformed given the lack of information systems and controls at the Company.

7.       That Defendants embarked on their new plan without being adequately informed and without the necessary information systems, controls, and procedures is exemplified by what Defendants reported to the public shortly before the Company's bankruptcy.  Just days before the bankruptcy filing, Defendant Corzine explicitly assured the public the Company's management had "husbanded our capital and strengthened our liquidity."  Similarly, Defendant Steenkamp, told a credit ratings agency that MF Global's "capital and liquidity has never been stronger." These statements, like the development of the earnings scheme itself, were uninformed, grossly negligent, and reckless.  Defendants were "flying blind," operating without the information they

needed, and without the necessary systems and controls in place to avoid the liquidity risks they knew existed. Their uninformed actions ultimately drove the Company into bankruptcy.

8.      Defendants embarked on their scheme without informing themselves (or the Board) of the true risks and without adequate processes and controls despite the fact that, throughout their tenures, they were repeatedly warned by internal auditors, risk managers and outside consultants that the Company's systems, controls, and procedures were inadequate. Instead of taking necessary steps to fix those problems, Defendants – in violation of their fiduciary duties to the Company and in bad faith – pursued an even riskier plan, relying on information they knew to be inaccurate and inadequate, further straining inadequate controls and risk monitoring systems beyond their capabilities. As a result, the Company did not and could not effectively monitor the liquidity strain caused by its unprecedented volume of proprietary trading, including in Euro RTMs. The Defendants' inaction and entrenchment in the face of the Company's control deficiencies that put the Company at significant risk were so far beyond the bounds of any reasonably informed judgment given the pervasive lack of information and systems and controls to manage the associated risk.

9.      The Defendants never informed the Board about the true liquidity challenges that arose in the Company's final months, or about deficiencies in the Company's ability to track liquidity. Nor did the Defendants inform the Board they would use segregated customer funds to cover the debt they created. While the MF Global's Assistant Treasurer privately referred to the Company's liquidity management a "shell game," the Defendants publically trumpeted that the liquidity position of the Company was never better, which Defendants knew or should have known was false. Defendants did not have an adequate understanding of what the liquidity position of the Company really was because they failed to establish the required systems and

controls.  Consequently, advice or approvals Defendants received from the Board were based on

materially incomplete information that would not allow the Board to make informed judgments.

Moreover, Corzine, as the architect of the Euro RTM trading, was personally invested in using

the trades so he could improve the Company's stock price by propping up the apparent financial

performance of the Company to get him "in the money" on his stock options.  Indeed, it has been

reported that Corzine, both publicly and privately, commented on how he was going to make

significant money on his MF Global options.

10.    As alleged in more detail below, the claims asserted by the Litigation Trustee are

based on Defendants' grossly negligent and reckless conduct, committed in the absence of good

faith and in breach of their fiduciary duties, which include, but were not limited to:

- Failing to adequately inform themselves of all material information

    concerning the financial resources of the Company, including the available

    liquidity of the Company, before deciding to transform the Company's

    entire model from that of a commodities broker to that of a broker-dealer

    ("B/D") and investment bank;

- Using high-risk Euro RTMs to give the appearance of sustainable

    revenues and earnings in the interim during the transition to a B/D and

    investment bank without the necessary material information and controls

    in place, which put the Company's balance sheet at risk;

- Increasingly engaging in proprietary trading with insufficient information;

- Relying on and failing to fix and/or improve the Company's information

    systems and controls for liquidity monitoring and forecasting and fund

    transfer tracking and recordation, despite knowing such systems were

inadequate in view of their shift to a plan requiring more intensive use of the Company's liquidity and accurate real-time information about liquidity sources and uses;

- Failing to fill vacant high-level positions responsible for independent assessment of capital and liquidity risks, despite their awareness of the importance of appropriate management of capital, liquidity, and funding during the implementation of their new direction for the Company;

- Effectively demoting and then dismissing the Company's Chief Risk Officer, Michael Roseman, who had expressed concerns to the Board of Directors about the Company's debt exposure and liquidity risk and replacing him with one of Corzine's former colleague at Goldman Sachs, who did not have the necessary and adequate experience for the position.

- Ignoring the warnings of outside consultants that, if they proceeded with their new direction, the Company had to improve its risk management infrastructure, operations, technology, and Finance Department;

- Pursuing a Euro RTM strategy that was intended to create the appearance of sustainable increased revenues but was dependent on taking on significant liquidity risks without moving the Company towards true profitability;

- Exceeding trading limits imposed by the Board of Directors on Euro RTMs (limits that were set without the Board being fully informed about the extent of the Company's liquidity stress resulting from Defendants' Euro RTM strategy);

7

- Allowing the Company's capital and liquidity to reach dangerously low levels while continuing to commit its capital and liquidity to proprietary trading and the Euro RTM strategy that presented unreasonable risk;

- Continuing to advocate for increased exposure to the liquidity risks of Euro RTM trades despite their awareness that positions described as hedges or offsetting positions were of shorter duration than pertinent long positions, which meant that the longer positions were not fully hedged and risked greater liquidity demands when the shorter duration positions matured;

- Failing to engage in meaningful contingency planning to mitigate the liquidity pressures posed by the Euro RTM trades until the margin calls associated with these positions became unsustainable, despite increasing liquidity demands, the Risk Department's stress scenario analyses, warnings from the Company's Chief Risk Officer, and inquiries from the Company's regulators;

- Failing to adequately inform the Board about the B/D's reliance on futures commission merchant ("FCM") funds, the B/D's actual growing use of those funds through intraday loans from the FCM, and the increased liquidity pressure that generated the need for these transfers through the summer of 2011;

- Permitting the misuse of customer funds by using and investing those funds to deal with the consequences of their repeated and continuing breaches of fiduciary duties in violation of CFTC regulations; failing to

8

ensure that the Company continuously complied with regulatory capital

requirements; and failing to ensure the safety of customer funds.

11.     Defendants' repeated breaches of their fiduciary duties—and their efforts to

conceal them—have received widespread attention.  Congressman Spencer Bachus, the

Chairman of the House Committee on Financial Services, reported having "little doubt"

Defendant Corzine ran the Company as his "alter ego" and "readily short-circuited" internal

controls.  The U.S. Treasury Department's Office of Financial Research has reported a pattern of

"significant failures of risk governance at MF Global" and that Corzine created "a culture in

which the [Chief Risk Officer] position was not sufficiently independent and empowered to

restrain decisions by senior management that put the firm at risk."  The Securities Investor

Protection Act ("SIPA") Trustee stated that MF Global's internal controls "were obviously

ineffective or ignored," and that "there was knowledge that segregated funds were being

improperly moved."  House of Representative members have asked the Attorney General to

investigate whether Corzine perjured himself before Congressional Committees during hearings

on MF Global's collapse.

12.     Defendants' breaches of their fiduciary duties inflicted material damages on the

Company.  They led to shortfalls in customer funds, a potential buyer withdrawing from

negotiations to buy the Company, the commencement of the SIPA liquidation of MFGI, the

appointment of Special Administrators for the Company's UK-based subsidiaries, the Chapter 11

bankruptcy cases of the Debtors, the cessation of MF Global's business operations, the filing of a

damning complaint by the CFTC, and significant lawsuits brought by customers and investors.

These breaches of duty caused the destruction of MF Global's value as a going concern.

## JURISDICTION AND VENUE

13.     On October 31, 2011, Holdings Ltd. and FinCo filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  On December 19, 2011, Capital, FX Clear and Market Services filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  On March 2, 2012, Holdings USA filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  The Debtors' cases (collectively, the "Chapter 11 Cases") are jointly administered pursuant to Bankruptcy Rule 1015(b) [Docket Nos. 19, 298, 528] in the Bankruptcy Court under the caption, *In re MF Global Holdings Ltd., et al.*, Case No. 11-15059 (MG).

14.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and Rule 7001(1) of the Federal Rules of Bankruptcy Procedure.  This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E) and (O).

15.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE PARTIES

16.     The Litigation Trustee is litigation trustee of the MF Global Litigation Trust.  The MF Global Litigation Trust was created pursuant to the Second Amended and Restated Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code for MF Global Holdings Ltd., MF Global Finance USA Inc., MF Global Capital LLC, MF Global FX Clear LLC, MF Global Market Services LLC, and MF Global Holdings USA Inc. [Docket No. 1382], which incorporates amendments approved by the Bankruptcy Court on May 2, 2013, in its Order Granting the Plan Proponent's Motion for Entry of an Order Approving Nonmaterial Modifications to the Plan Pursuant to Section 1127(b) of the Bankruptcy Code [Docket No.

1376] to the Amended and Restated Joint Plan of Liquidation Pursuant to Chapter 11 of the

Bankruptcy Code for MF Global Holdings Ltd., MF Global Finance USA Inc., MF Global

Capital LLC, MF Global FX Clear LLC, MF Global Market Services LLC, and MF Global

Holdings USA Inc., which the Bankruptcy Court confirmed on April 5, 2013 [Docket No. 1288].

17.    The MF Global Litigation Trust is the assignee of all right, title, and interests of

the Debtors to the Trust Assets, including, but not limited to, the claims asserted in the complaint

Louis J. Freeh, who was the Chapter 11 Trustee for the Debtors, filed against Defendants.

18.    Defendant Corzine served as Chairman of the Board and CEO of Holdings Ltd.

and CEO and a Director of MFGI between March 23, 2010, and November 4, 2011, when he

resigned.  Before joining Holdings Ltd., Corzine was Chairman, senior partner, and Chief

Financial Officer at Goldman Sachs.  Corzine also served as United States Senator from New

Jersey between 2001 and 2006 and Governor of New Jersey from 2006 to 2010.

19.    Defendant Abelow joined Holdings Ltd. in September 2010 as Chief Operating

Officer ("COO") and Executive Vice President, and became Holdings Ltd.'s President in March

2011.  Before joining Holdings Ltd., Abelow served as New Jersey State Treasurer and Chief of

Staff to Corzine during Corzine's tenure as New Jersey's Governor.  He previously had been a

partner and managing director at Goldman Sachs, working closely with Defendant Corzine.

20.    Defendant Steenkamp served as Holdings Ltd.'s CFO starting in April 2011.

Before that, Steenkamp was Holdings Ltd.'s Chief Accounting Officer and Global Controller.

21.    Holdings Ltd., a Delaware limited liability company, is a holding company

headquartered in the United States.  Holdings Ltd.'s  predecessor, Man Group plc, acquired the

regulated futures and commodities trading business entities of Refco, Inc. in November 2005.  In

July 2007, Man Group plc consummated an initial public offering and changed its name to MF

Global Ltd. (which was later changed to MF Global Holdings Ltd., when the company changed

its place of incorporation from Bermuda to Delaware). Holdings Ltd.'s common stock was

traded on the New York Stock Exchange.

22.    MFGI, a Delaware corporation, is one of Holdings Ltd.'s principal indirect

subsidiaries and was one of its primary operating businesses. MFGI was registered with the

National Futures Association as an FCM and with FINRA as a B/D.

23.    FinCo was MF Global's financing arm. It provided funding for MF Global's

United States subsidiaries, including MFGI. FinCo obtained funds from a variety of sources,

including the Company's revolving credit facilities. FinCo also provided funds used by MFGI to

post margin related to the Euro RTMs.

## FACTUAL ALLEGATIONS

**A.    Defendants Take Over Management and Operations of the Company.**

24.    Corzine became MF Global's CEO in March 2010. He was ultimately

responsible for the Company's administrative, back office, and technology functions, including

the adequacy of the Company's risk management and internal controls.[3] Corzine's control and

involvement in the day-to-day business of the Company would grow significantly and expand

into areas traditionally outside the role of the CEO. For example, as alleged in more detail

elsewhere in this complaint, Corzine maintained his own trading book and actively engaged in

proprietary trading. Corzine also maintained supervisory authority over other traders, in addition

to other roles relating to trading. Corzine's role in proprietary trading for the Company was

instrumental in leading to the breaches of fiduciary duties and financial collapse of the Company.

---

[3] "Back office" generally refers to operations and technology units that are intended to
ensure smooth settlement of transactions and maintenance of a company's technology systems,
and includes record keeping, trade confirmation, and trade settlement.

25.     Shortly after Corzine arrived as CEO, he began plugging new individuals into key positions in the Company.  Some of these individuals were controlled by and reported to Corzine in their prior employment.  For example, in September 2010, Corzine recruited and hired Abelow to serve as COO.  Abelow had worked under Corzine at Goldman Sachs and had served as Corzine's chief of staff during his tenure as Governor of New Jersey.  Abelow was responsible for oversight of the Company's operations, including the day-to-day execution of the Company's strategy, and had direct responsibility for operations, including treasury operations, information technology, human resources, risk management, procurement, and facilities management globally, which were all infrastructure-related functions.  When Abelow became President in March 2011, he assumed additional responsibility for the Company.

26.     Also, within a year of his arrival, Corzine effectively demoted and then dismissed the Company's Chief Risk Officer ("CRO"), Michael Roseman ("Roseman"), who had expressed concerns to the board of directors about the Company's debt exposure and liquidity risk.  Roseman's replacement as CRO was Michael Stockman ("Stockman"), another Goldman Sachs alumnus.  Stockman, however, did not have the requisite experience with global debt trading, futures or most importantly, liquidity analysis.  This was a significant move given the role of the CRO, and would prove instrumental in allowing the breaches of fiduciary duties that would occur relating to the Company's new trading plan.  According to its Enterprise Risk Policy (the "Risk Policy"), which documents MF Global's Enterprise Risk Management approach and framework, MF Global's CRO had "global responsibility for controlling credit, market, operational, concentration, capital, and liquidity risks," and primary authority, delegated by the Board, for market and credit risk oversight.  Until Corzine demoted the CRO position, the

CRO reported to the CEO and, according to Company policy, had direct access to the Board any time as required.

27.    After becoming CEO, Corzine also began to rely on Defendant Steenkamp, the Company's Chief Accounting Officer, even though Randy MacDonald ("MacDonald") was the Company's approved CFO.  In April 2011, Corzine replaced MacDonald as CFO with Steenkamp.  As the head of MF Global's financial operations, Steenkamp had authority over and responsibility for the Company's financial operations, including treasury, accounting, and all global financial control and reporting functions.  Among his responsibilities, Steenkamp was supposed to monitor liquidity, protect customer funds, and fund MF Global's operations, including the Company's proprietary trading.  Even before he became CFO, Steenkamp was responsible for giving financial presentations to the Board and designing financial messages supporting Corzine's transition to a B/D and investment bank model and his Euro RTM trading.

28.    From the start, Corzine gave lip service to the importance of risk management, but was grossly negligent in failing to insure adequate risk management controls were in place. For example, in a May 20, 2010 earnings press release, Corzine stated that he would "ensure the appropriate controls are in place" at the Company.  During a June 3, 2010 investor conference, he stated that risk management is "something that I've worked on most of my life and I think that we can bring . . . the operations, the systems, [and] the technology to managing risk."  Corzine also stressed his commitment to improving MF Global's "client facilitation efforts" and market execution as part of his duties.  Abelow was supposed to play a key role in ensuring these commitments were met.  Abelow's performance objectives for the fiscal year beginning April 1, 2011, included:  "adequately building out the technology platform"; "act[ing] as a constructive check on the Chairman and CEO [Corzine], particularly in matters of risk, capital allocation and

strategic execution"; and "effective review and oversight of the Firm's risk positions, including those that are reputational, operational, market-related, credit-regulated, and regulatory."

## B.    Defendants Embark on a New, High-Risk Path

29.    Early in his tenure, Corzine set the Company on a new path that was very different than the historical direction of the Company.  When Corzine joined Holdings Ltd. as CEO in March 2010, MFGI, an indirect subsidiary of Holdings Ltd. operating in the United States, was the primary operating business of the Company.  MFGI had separate B/D and future FCM businesses.  At that time, MFGI earned revenues primarily (1) through commissions earned from executing customer orders, and (2) from interest earned on customer funds and its matched repurchase agreement book.  Corzine and other Defendants sought to transform MFGI into a B/D and investment bank that generated revenue through other means.  Corzine and the other Defendants knew this transition would significantly test the Company's liquidity and increase the Company's overall risk profile, which required the Company to put in place controls and systems that would enable the Company to track adequately its liquidity and other financial measurements.  But Defendants failed to implement those needed systems and controls.  Instead, Corzine's stated mantra was "earnings now," and he recklessly charged into:  (1) principal trading; and (2) highly-leveraged investments in European sovereign debt instruments using so-called Euro RTMs, without fully informing themselves or the Company of all material information and without adequate controls.

### 1.    The Principal Trading Component

30.    The principal trading component involved taking positions in various commodities, securities, and other instruments or products to either facilitate client trades or to attempt to earn revenues using the Company's own funds through proprietary trading.  Shortly after Corzine joined the Company, he established the Principal Strategies Group ("PSG") as a

trading unit within MFGI to engage in this proprietary trading. Corzine himself actively engaged

in proprietary trading, and maintained his own trading book – an unusual role for a CEO.

Indeed, as time went on, Corzine spent a considerable amount of time trading on the fixed

income trading desk in accounts under his control. Corzine supervised the traders in PSG from

the time the unit was established, and even after the Company hired someone to be the formal

supervisor, Corzine maintained hands-on supervisory authority over the traders and was involved

in recruiting traders and trading groups.

31.     The new proprietary traders hired by Corzine required large amounts of daily

liquidity to fund their trading. Their activities ultimately had the effect of increasing stress on

the Company's liquidity, which more than ever was something the Defendants needed to be fully

informed of and have adequate controls in place to monitor to ensure the financial health of the

Company. The increased proprietary trading under Corzine put additional pressure on the

Company's deficient controls without producing any meaningful improvement in revenues.

32.     New proprietary trading desks established by Corzine also consumed additional

liquidity. For instance, from early 2011 through the summer of 2011, the Company accumulated

an increasingly long list of securities that could not be financed with third-party funds, requiring

the Company to finance those securities directly with its already stretched house funds.

**2.      The Euro RTM Component**

33.     The Euro RTM component involved the Company trading in the sovereign debt of

European countries by using RTMs to purchase European sovereign debt. Corzine came up with

the idea of using these Euro RTMs and portrayed it as a way to "bridge" the Company's

revenues during MF Global's transformation to B/D and investment bank. The Euro RTM

transactions allowed MF Global to generate artificial, accelerated income from the "sales" of

bonds that MF Global was required to repurchase shortly before maturity, thereby bearing all the risk of default.[4]  Although a repo typically is accounted for on a balance sheet as a collateralized financing that increases balance sheet leverage, the Euro RTMs were accounted for as "sales." Accordingly, the European sovereign securities were removed, or "derecognized," from the Company's balance sheet, and the gain on the Euro RTMs was recognized as of the date the transaction was entered into, leading to the recognition of revenues at the outset of the transaction.  The Company's revenues on these transactions consisted of the difference between the price of the securities and the cost of financing their purchase.  By accounting for these transactions as sales and the artificially generated funds as revenues, Defendants were able to create an impression that Corzine would return the Company to profitability while obscuring that the Company was holding very large positions in Euro sovereign debt.

34.    Defendants relied primarily on the Euro RTM "income" to report improved earnings that gave a skewed picture of the financial health of the Company.  For example, for the quarter ending March 31, 2011, the Euro RTM income allowed the Company to report that it cut its net loss from approximately $92 million to approximately $46 million.  For the quarter ending December 31, 2010, the Euro RTM income allowed the Company to report that it cut its net loss from approximately $29 million to approximately $5 million.  For the quarter ending September 30, 2010, the Euro RTM income allowed the Company to report that it cut the Company's net loss from approximately $54 million to approximately $39 million.  For the quarter ending June 30, 2011, the Euro RTM income allowed the Company to report net income of $13 million, instead of a net loss of more than $23 million.  Despite these financial reports, the Euro RTM

---

[4] Because MF Global was required to repurchase Euro RTMs two business days *before* maturity, they were not true "repurchases to maturity" from a consolidated balance sheet perspective.

"income," in truth, was dependent on the ability of the Company to continue to finance its huge holdings of Euro sovereign debt and on the assumption that the Euro sovereign debt would not default.

35.     These Euro RTMs allowed Corzine and the other Defendants to generate unsustainable revenues to create a skewed picture of the Company's financial health, often at the end of reporting quarters.  Defendants repeatedly relied upon Corzine's Euro RTM trading to help the Company report that it had met its quarterly revenue goals.  During several fiscal quarters between 2010 and 2011, Corzine placed Euro RTM trades at or near the end of the quarter in order to generate revenue for that quarter.  For example, in the last four days of the quarter ending March 31, 2011, the Company placed Euro RTM trades worth approximately €1.85 billion, or approximately $2.62 billion.  Of that amount, on March 31, 2011 alone, the Company placed several large Euro RTM trades worth approximately €725 million, or approximately $1.03 billion.  At Corzine's direction, the Company's financial personnel calculated the level of Euro RTM trading that would be necessary to generate sufficient revenues so that the Company could report that it satisfied its earnings target.  As the required level of trading increased, so did the liquidity risk to the Company.

36.     This heavy reliance on Euro RTMs was inherently unsustainable over the long-term.  Each new revenue-producing position required the posting of initial margin, which tied up liquidity for the duration of the investment and introduced the possibility of future margin calls.  Through the Euro RTM strategy, Corzine propped up the Company's apparent financial heath in the short run, but created substantial longer-term risks that ultimately were realized when the Company lacked the necessary liquidity to meet its obligations.  Defendants knew or should have known these risks were significant because, among other things, the Company did not have

adequate systems and controls to monitor liquidity and other risks.  But Corzine and the other

Defendants recklessly failed to create adequate systems and controls.  As a result, Corzine and

the other Defendants never fully understood the liquidity and other risks these transactions

presented to the Company.  This reckless behavior ultimately resulted in the Company's demise.

37.     Corzine was the mastermind of the Euro RTM trading, which was a prime focus

of his attention.  Corzine initially pressured the proprietary traders he hired to generate quick

profits.  When those efforts failed, Corzine turned to Euro RTM trading as a shortcut to generate

unsustainable short-term income, with no business justification for the risks the Company

incurred.  In addition to his Euro RTM trades, the Company was also trading in other high-risk

investments, which put additional strains on liquidity, but the RTMs allowed the Defendants to

artificially inflate revenue at the outset of the transaction.   On a regular basis, Corzine sought

information on potential profit opportunities for certain country positions from the fixed income

traders at MF Global's United Kingdom affiliate, MF Global UK ("MFG UK"), then dealt

directly with one of the Company's proprietary traders or the MFG UK fixed income trading

desk to instruct them when to place Euro RTM trades.  Corzine became so invested in the Euro

RTM trading that it compromised his ability to govern the firm adequately to the point members

of the Board instructed him to focus on managing the Company.

**C.     The Company Lacked the Necessary Controls For the Company's New Path.**

38.     The Company lacked the necessary systems and controls to obtain accurate and

reliable information needed to manage these high-risk Euro RTM trades.  As Corzine himself

stated during a May 2010 earnings call:

> As we grow these activities we will be mindful of the necessity to
> enhance and reconfirm our operational and control functions and to
> secure the talent necessary to manage attended [sic] market risks.

39.    The Company's Risk Policy identified liquidity risk as the "[r]isk that the [Company], although solvent, either (1) does not have available sufficient liquid financial resources to enable it to meet its obligations as they fall due or (2) can secure sufficient liquid financial resources only at an excessive cost."  Defendants failed to take basic steps required by the Risk Policy that were reasonably designed to provide the necessary information to manage liquidity risk and would have enabled the Company to monitor and mitigate its liquidity risk. Defendants were grossly negligent in failing to take these steps that were necessary under the circumstances to monitor and adequately manage the risks the Euro RTM transactions presented. The liquidity crunch that would eventually lead to the financial collapse of the Company was the type of information these tools were designed to monitor so informed decisions could be made.

40.    For example, the Risk Policy specifically called for a new position in the Risk Department, Global Head of Capital & Liquidity Risk, to take responsibility for

> independent and objective assessment of liquidity risk; reviewing liquidity scenario analyses conducted by [the] Treasury [Department], as well as risk scenarios conducted by other risk areas (*i.e.*, operational risk, credit risk, market risk) that may lead to liquidity events; monitoring liquidity against limits outlined in the Risk [Delegations of Authority]; and presenting independent liquidity-risk information and intelligence through the CRO to senior management and the Board.

Despite extending the Company's business lines into principal trading and Euro RTMs, Defendants never filled the position of Global Head of Capital & Liquidity Risk.

41.    The Risk Policy also called for development of a Liquidity Risk Methodology Document that would include a contingency funding plan to assess potential liquidity requirements arising from adverse market or operational situations.  Defendants recklessly failed to develop the Liquidity Risk Methodology Document.

20

42.    The Risk Policy assigned to the Company's Treasurer the responsibility to "ensure that effective liquidity forecasting and cash management processes are in place, documented and functioning across MF Global, including specific processes to identify any expected cash items that remain outstanding and appropriate action to cover any shortfall." These processes were to include "a liquidity plan that assesses the [C]ompany's liquidity requirements based on the planned volume and composition of business activity for the upcoming period," and "a detailed analysis of projected sources and uses of funds for each MF Global entity."  But the Treasurer lacked the ability to complete the tasks assigned to him under the Risk Policy, because the Company did not establish systems to generate accurate liquidity forecasts, a necessary risk management took given the new high-risk strategies.

43.    The Defendants received numerous red flags, from both internal and external sources, confirming that the proper risk management tools were not in place.  The Risk Department flagged the Company's failure to establish and maintain adequate policies, procedures and practices for monitoring its risk.  The Risk Department analyzed dozens of gaps between the Company's written-risk control policies as described in the Risk Policy and the Company's actual risk control practices (the "Gap Analysis").  The Risk Department placed a "high" priority on certain risks that limited the Company's ability to monitor and forecast its liquidity, which was material information the Defendants and others at the Company needed to have to make informed judgments, especially in connection with risky Euro RTM trading:

- The Company had not developed liquidity risk scenario analyses and stress tests; and

- The Treasurer lacked the appropriate personnel and technology to conduct independent liquidity monitoring and forecasting or economic capital risk

analysis.  The Gap Analysis stated that the Treasurer "[c]annot produce accurate forecasts because underlying data is inadequate."

44.      The Gap Analysis also identified a number of weaknesses as having a "moderate" priority level of risk, including the following, which are discussed in more detail above:

- The Company's failure to hire someone to fill the important role of Global Head of Capital & Liquidity Risk; and

- The Company's failure to develop the Liquidity Risk Methodology Document, which was supposed to document the Company's contingency funding plan.

45.      The Risk Department presented the Gap Analysis at the May 26, 2010 meeting of the Audit and Risk Committee attended by Corzine and Steenkamp.

46.      In October 2010, a status update on the numerous gaps between the Company's policies and practices identified almost a half year earlier (the "Gap Analysis Update") showed that, inexplicably, Defendants had not remedied the information and control gaps.  To the contrary, the Risk Department considered that some of the problems had become more serious. The Risk Department presented the Gap Analysis Update at a meeting of the Audit and Risk Committee attended by Defendants.  Among other things, the Gap Analysis Update reported:

- Out of 32 gaps previously identified, only two had been resolved, and all but one of the high priority risk gaps persisted.

- Certain high priority risk areas, such as the need for liquidity risk scenario analyses, stress tests, and metrics to gauge return on risk-adjusted capital, remained "under development" with the Company unable to "measure Liquidity Risk against Risk Appetite."

- The gaps in economic capital risk measurement, liquidity risk scenarios and operational risk profile had been elevated to "critical" priority status.

47.   The Internal Audit Department also alerted Defendants to the Company's deficient tools for monitoring its risk:

- A May 2010 Internal Audit report addressed to Corzine and others concerning corporate governance found that MF Global's risk limitation and monitoring policy lacked key limits significant to the operation of a B/D; and

- An October 2010 Internal Audit report on Market and Credit Risk Management addressed to Corzine, Abelow and others warned of the "High Risk" arising from the lack of controls over risk reporting, and alerted that market risk policies had not been updated to reflect MF Global's then-current operating environment.

48.   Defendants also received warnings from external consultants about the inadequacy of the Company's controls and the need to improve them before embarking on their risky new plan.  At the December 15, 2010 Board meeting, representatives of the Boston Consulting Group ("BCG"), which had been retained to advise Corzine on the Company's future business direction, warned that, to implement that strategy, certain "key initiatives" were "required."  Among other things, the Company needed to:

- "[b]uild out robust risk management infrastructure, including platforms, tools, policies, and procedures for both market making and principalling;"

- "[s]hore up" operations and information technology for reliability and scalability; and

- provide greater management information systems and transparency in the Finance Department through tools and systems.

**D.      Defendants Failed to Correct the Known Risk Control Deficiencies And Implemented Their Risky New Trading Practices Without Adequate Information.**

49.     Despite the many warnings Defendants received, they utterly failed to implement systems to provide them with the information they needed, and thus were unable to make informed business decisions in implementing their new strategy.  Defendants knew that the Company had liquidity and capital management risks, a wholly inadequate control environment, and a lack of adequate information about important aspects of its business.  Defendants also knew that they needed to address these shortcomings in connection with their planned changes in the Company's business.  Nevertheless, Defendants consciously failed to remedy these problems and knowingly operated the business without the complete and accurate information they needed.  The Company's inability to monitor, track and forecast liquidity and capital management caused its demise, and that inability flowed directly from Defendant's reckless failure to implement the required systems and controls they had been warned, and knew, was a necessary precondition to engaging in the risky, highly-leveraged trades that they pursued.  Without those systems and controls in place, Defendants took actions without adequately informing themselves, in breach of their fiduciary duties, which resulted in the Company's demise.

50.     Indeed, shortly before the Company's collapse, the Internal Audit Department found that there were *176 open action items* previously presented to the Audit and Risk Committee of the Board that had not yet been resolved.  The report forecasted increased risk for the Company because of the likelihood that the Company's business growth was "outpacing [the] growth of the related support functions."

24

## 1.    Deficient Liquidity Management and Procedures

51.    More than a year after the Risk Department alerted Defendants to control deficiencies in the Gap Analysis, the Internal Audit Department issued a report in June 2011 (the "June 2011 Internal Audit Report") advising that "[e]xisting liquidity monitoring and forecasting is manual and limited.  Reporting capabilities to evaluate liquidity needs for transactions that are booked but not yet settled have not been fully developed."  The June 2011 Internal Audit Report also found that "[e]xisting performance of formal stress testing and scenario analysis is not adequate to fully assess liquidity and capital needs."  It warned that:

> The complexity of capital and liquidity demands have increased with the addition of principal trading across the [Company's] customer facing desks, [PSG], and other previously approved new businesses.  These additional stresses further emphasize the need for a more formal and consistent approach to liquidity and capital management.

52.    The June 2011 Internal Audit Report also identified a "key man" risk in connection with liquidity reporting, monitoring and forecasting tools, specifically noting that "[t]he lack of formal reporting, monitoring and forecasting creates an unnecessarily high reliance on key employees and increases the risk exposure should these staff members leave the [Company]."  The Internal Audit Department's concern was based on the Company's reliance on the expertise and experience of a single employee in the Treasury Department, the Assistant Treasurer Edith O'Brien ("O'Brien").

53.    Defendants were aware that the Company lacked a formalized process for approving new business initiatives, including determining the availability of funding for such initiatives.  Indeed, the June 2011 Internal Audit Report designated Steenkamp and Abelow (and others reporting to them) as responsible for resolving the identified issues, but Defendants continued to engage and expand their risky new trading practices without every resolving many

25

issues identified by Internal Audit and without ever developing "a more formal and consistent approach to liquidity and capital management. Defendants also were aware that the Company needed a method of managing and responding to capital requests from the individual trading desks. Yet as of October 2011, the month of the Company's financial collapse, Defendants had not established such a method or process, and requests continued to be handled informally.

54.      As summarized by a staff report for the House of Representatives Subcommittee on Oversight & Investigations, "[b]y the summer of 2011, it had become clear to MF Global that Corzine's strategic plan had increased the company's liquidity demands. In June, MF Global's internal auditors assessed the processes and controls in place to manage the company's liquidity. The auditors found *numerous and significant gaps between the company's liquidity policies* and existing practices. Among other problems, the internal auditors found that *"existing liquidity reporting is manual in nature,"* that MF Global had *never established a "formal liquidity management framework,"* and that "*existing performance of formal stress testing and scenario analysis is not adequate* to fully assess liquidity and capital needs." (Emphasis added.) This made it making it almost impossible to properly monitor the liquidity drains on the Company caused by Corzine's proprietary trading.

55.      The inadequate controls also prevented the Company from knowing, during the last week of its existence, that customer segregated funds at the FCM were being used to meet the B/D's liquidity needs and satisfy an obligation of MFG UK. In testimony before the House Committee on Agriculture on December 8, 2011, Terrence Duffy, Executive Chairman of CME Group Inc., stated that was the *first time in history* that a shortfall in customer segregated funds occurred as a result of the clearing member's improper handling of customer funds and the *first*

*time in history* that a customer suffered a loss as a result of such improper handling of customer

funds.

> **2.      Deficiencies in the Treasury Department, Including the Use of Ad Hoc
>           Liquidity Monitoring Tools**

56.      MF Global's Treasury Department also had inadequate systems for monitoring

treasury operations, liquidity, and capital risk.  As Corzine orchestrated the expansion of MF

Global's proprietary trading, the Company also failed to integrate or upgrade its various

technology systems and platforms even though Defendants knew such actions were necessary to

enable the Company to track reliably its funding and cash flows.  According to a Finance

Department officer, the Treasury Department's systems were a "hodgepodge of systems and

processes without a design."  The Treasury Department's systems produced inaccurate books

and records, and the Finance Department often had to make manual corrections in order to

ensure the Company's books and records were accurate.

57.      In November 2010, the CFO of MFGI, Christine Serwinski ("Serwinski"),

reported to Steenkamp problems with FinCo Treasury's back office bookkeeping system, which

recorded intercompany lending and client margin financing transactions ("November 2010

Report").  Among other things, Serwinski reported an increase in the number and dollar amount

of bank reconciling items since July 2010, resulting in increased manual journal entries and

accounting adjustments, delays in the close process, and incorrect posting of items.  In the

November 2010 Report, Serwinski stated that attempts to address these items and other issues

around the accurate and timely reporting of the FinCo balances have been "to no avail," and that

"[a]t this point, confidence in the ability to accurately and timely report balances is declining."

58.      In the November 2010 Report, Serwinski also informed Steenkamp that due to

these problems, MFGI had overstated its excess net capital, and crossed the internal global

capital thresholds as the result of an October 2010 $25 million wire from MFGI's house account

to MF Global Holdings Hong Kong Ltd.  Despite several email exchanges and discussions, the

Finance Department was not able to confirm the exact nature of the transaction.

59.     Corzine and the other Defendants were aware as early as May 2010 that the

Treasury Department lacked the necessary systems and technology to conduct accurate liquidity

monitoring and forecasting across its global operations.  But even as they implemented

increasingly risky trading practices, Company management did not take steps to rectify

Treasury's inability to accurately monitor liquidity and forecast until July 2011, when they began

discussing hiring a vendor to develop an integrated global treasury system.  Even then,

Defendants did not even schedule its vendor selection and implementation phase until February

2012.  By the time the Company got around to even considering a vendor, the Defendants had

over-leveraged the Company through the Euro RTM transactions without sufficient information

and controls to assess accurately the liquidity and other risks that would eventually lead to the

Company's financial collapse.

60.     Corzine and the other Defendants knew having an accurate and timely

understanding of liquidity was a critical piece of information the Company and its leaders

needed.  They also knew (or were reckless in not knowing) that the "system" they used for

determining the Company's liquidity on a daily basis was grossly inadequate.  In the absence of

an automated global treasury system, Treasury Department officials attempted to manually track

the movement of money among the Company's legal entities.  They reported the B/D's liquidity

through an ad hoc daily snapshot called the "liquidity dashboard," towards the end of 2010.  This

snapshot was a wholly insufficient mechanism to track liquidity, especially once the Company

began its risky new trading practices.  For example, the liquidity dashboard did not differentiate

between different types of capital, some of which were available and some of which were not. The liquidity dashboard also considered certain customer funds held by the FCM to be an available source of liquidity, even though there are strict rules about what the FCM could do with these customer funds, which were generally off limits to the B/D.

61.     As Defendants knew, the liquidity dashboard was simplistic, inaccurate, and wholly inadequate to measure the cash available to the B/D.  Accordingly, Defendants knew or should have known that the snapshot could not be relied upon to make informed judgments about liquidity risk.  Notwithstanding the known inadequacies of the liquidity dashboard, Corzine and other senior officers used it as their only source of liquidity information.  Indeed, as discussed above, the June 2011 Internal Audit Report criticized the Company's reliance on "ad hoc tools" to manage liquidity.

62.     In addition to the known inadequacy of the liquidity dashboard, MF Global had continuing problems monitoring, gathering, and internally reporting accurate financial data.  For example:

- the Finance Department could not produce a high-level overview of cash flows for a defined period because the Finance Department did not have the systems needed to generate such a report;

- intraday transfers between the FCM and the B/D were recorded through nothing more formal than email communications and manual data entry; and

- the Treasury Department also lacked a tool to monitor the Company's leverage more frequently than at the end of each quarter despite the fact that leverage was one of the measures on which the credit ratings agencies and analysts focused in assessing the Company's performance.

63.     As senior executives of the Company, Defendants knew (or recklessly failed to inform themselves) of all these problems.  Despite numerous red flags and warnings, Defendants recklessly failed to address these problems, which came to a head in the weeks preceding the Company's collapse, when the Company was unable to properly track its financial data.

### 3.     Deficient Financial Regulatory Reporting

64.     The Financial Regulatory Group, a division within the Finance Department, was responsible for ensuring that MFGI complied with all of the regulatory requirements applicable to a B/D and an FCM.  In preparing the required regulatory reports for the Company, the Financial Regulatory Group relied heavily on end-user computing tools ("EUCs"), including Excel spreadsheets and databases, to perform many of their reporting and reconciliation duties.

65.     In May 2011, the Internal Audit Department alerted Defendants that the Regulatory Reporting team lacked controls over the ability to modify and access key EUCs.  The Internal Audit Department reported that, without adequate controls, EUCs "may not maintain the integrity of the data and therefore there is an increased chance that decisions may be made on inaccurate information or that monitoring reports may be incomplete."

66.     The May 2011 Internal Audit report also put Defendants on notice of serious control deficiencies in the preparation of the regulatory reports, specifically with regard to the process of gathering information.

67.     All the Defendants received the May 2011 Internal Audit report, which designated Steenkamp as the person responsible for all the issues identified.  But, despite their awareness of these issues, Defendants never took the necessary steps to remedy the situation.  As a result, and as specifically predicted by the internal audit report, Defendants continued making decisions

based on incomplete and inaccurate financial information.  The failure of Defendants to inform

themselves fully with accurate information repeatedly breached their fiduciary duties.

### 4.    Deficient and Wholly Inadequate "Back Office" Systems

68.    The Company also was unable to monitor the clearing and settlement of trades, a

crippling defect for a Company engaged in extensive clearing and settlement activity.  MF

Global used a variety of back office systems, rather than one global system, for the clearing and

settlement of trades.  The Company's various back office platforms were antiquated and showed

only limited position and account information.  A July 2011 Internal Audit report faulted one of

these systems for a "[l]ack of appropriate controls relating to the highly manual processes

associated with [mortgage-backed securities/to-be-announced mortgage-backed securities

("TBA")] trade matching, allocations and settlement of open TBAs."

69.    Fail reports generated by the systems, which indicated trades reaching the

settlement date that had not yet settled, were defective in that they showed false positives (that is,

they reported trades that had not reached their settlement date); and they did not provide

adequate descriptions of the reasons trades failed.  It was particularly important that the fail

information for TBA trades be accurate, because fails on these trades involved larger regulatory

capital charges.

70.    These system deficiencies required operations personnel to engage in a manual

process of generating the records necessary to clear and settle transactions, such as through

exchanging a continuous stream of emails.  The manual nature of this process made clearing and

settlement significantly more difficult during October 2011, when literally hundreds of

transactions had to be handled through this process.

31

71.     As the Company struggled to meet its financial obligations in the wake of ratings downgrades in October 2011, the limited systems used by back office staff exacerbated these problems.  Defendants failed to fix or replace the Company's back office systems with a single adequate system before the Company collapsed in October 2011.

72.     The weaknesses in MF Global's operations systems had a manifest impact on its business.  For example, fail reports that indicate whether trades reaching their settlement dates have not yet settled, significantly increased on October 25, 2011, but these reports were unreliable.  The system fail reports were defective in that (1) they showed false positives (i.e., they reported trades that had not reached their settlement date); and (2) they did not provide adequate descriptions for the reasons why trades failed.  These system deficiencies required Company personnel to engage in a manual process of generating the records necessary to clear and settle transactions, such as by exchanging emails.  The manual nature of this process made clearing and settlement more difficult in the final week of the Company's existence, when literally hundreds of transactions had to be handled through this manual process.  These defects and the manual nature of the resulting clearing and settlement processes directly affected the Company's ability to process trades efficiently in the final week of its existence.

**E.      Defendants' Euro RTM Strategy Exposed the Company to Excessive Risks Without Adequate Information and Controls to Account For and Control Those Risks.**

73.     Without the necessary risk controls in place to ensure informed business decisions could be made concerning liquidity and other risks, the Defendants exposed the Company to excessive risks through their Euro RTM trading practices.  When MFGI began acquiring the European sovereign debt positions through its agent MFG UK, each of the sovereign debt issuances was rated as investment grade.  Accordingly, MFGI was required to post only a small initial margin payment for these trades (as low as five percent of the face amount of the

securities financed), which allowed the Company to build a highly-leveraged portfolio with little up-front cost.

74.     Once it entered the Euro RTM positions, MFGI faced the risk that the clearinghouses or counterparties that financed the purchase of the Euro RTMs would demand additional margin.  Additional margin could be demanded in numerous situations:  (a) increased initial margin could be required by the clearinghouses if they determined that the Company had become less creditworthy; (b) increased initial margin could also be required by the clearinghouses if the clearinghouses determined that the risk inherent in the underlying security had increased; and (c) variation margin could be required based on a decline in the market value of the underlying security.  MFGI obtained the cash to meet these increased funding needs from FinCo.  Accordingly, financing the acquisition of securities through the use of repos had the potential to create a significant liquidity risk for MFGI and the Company as a whole.

75.     Because MF Global was at risk of a downgrade at the time it entered the Euro RTMs, the margins associated with these investments had the potential to reach extraordinary levels.  The rules of the Company's frequent clearinghouse for the Euro RTM transactions, LCH.Clearnet ("LCH"), provided that initial margin would be increased in connection with changes to a company's credit rating according to a formula:  the initial margin would be multiplied by 110% if the company was downgraded to an average rating of BBB-, and 200% if the company was downgraded to an average rating of BB+.  Any downgrade below BB+ allowed the clearinghouse to require the company to exit the clearinghouse and terminate its open trades.

76.     The capital used to finance the margin on Euro RTM positions was essentially trapped because MFGI could not unwind these trades before maturity without sustaining an unfavorable GAAP earnings treatment.

77.    For its short-term liquidity needs, MF Global relied on two separate revolving
credit facilities:  (1) a $1.2 billion unsecured committed revolving credit facility ("RCF") for
which Holdings Ltd. and FinCo were the borrowers; and (2) a $300 million secured committed
RCF for which MFGI was the borrower.  However, the RCFs were intended to serve only as
backstops for extraordinary situations – "a liquidity pool and not a component of [the
Company's] long-term capital structure," as Corzine stated in a February 3, 2011 earnings
conference call.  Although they were not intended to serve as a permanent source of liquidity,
over time the Company began to rely on the RCFs as its Euro RTM and other investments
strained its available capital.

## 1.    Corzine Rapidly Accelerated His Euro RTM Strategy

78.    Corzine first began trading in European sovereign debt through RTM transactions
in September 2010.  By the late summer or early fall of 2011, the Euro RTM portfolio had grown
to a gross figure of $11.7 billion, with approximately $3.5 billion in hedges, thus accounting for
a net position of $8.2 billion.

79.    The Euro RTM investments generated liquidity demands almost immediately.  In
November 2010, the LCH raised the initial margins required on Irish bonds three times from 7%
to 15%, then to 30%, and then to 45%. Each adjustment required the Company to provide
additional margin.  Around this time, and based partly on the LCH's decision, Roseman
estimated potential margin calls of $524 million associated with the Euro RTM investments.

80.    Corzine also lengthened the maturities of Euro RTMs in the Company's portfolio,
thereby exacerbating the liquidity demands and risks to the Company.  The maturities of the
positions that Corzine put on at the beginning of the Euro RTM investments in September 2010
did not exceed twelve months, but, beginning in December 2010, the maturities lengthened up to

twenty-one months, at the same time that the amount of these transactions increased.  Thus, the

Euro RTMs steadily increased both the amount of liquidity that was tied up and the period of

time that it was tied up.  Nevertheless, the Defendants continually assured the Board that the

Company had more than sufficient liquidity, including its RCFs and other credit lines, to manage

even the worst-case scenario.  Defendants made these assurances knowing that the Company's

liquidity tracking systems were inadequate and insufficient.  Their assurances were knowingly,

or recklessly, false because Defendants failed to inform themselves of the necessary information

to assess whether their assurances were accurate.

81.    Roseman, the Company's CRO, expressed concern in September 2010 about the

Company's liquidity and capital risks.  Shortly thereafter, Corzine informed Roseman that he

would no longer report directly to him, but would report instead to Abelow, the COO.  Roseman

disagreed with the change in the reporting line, viewing it as disempowering the CRO and

demoting both the position and the Risk Department as a whole.  He expressed his objections to

this reporting change to Corzine.  At the end of January 2011, Corzine replaced Roseman as

CRO, effective immediately.  Stockman became the Company's CRO.  He also reported directly

to Abelow.

82.    As Corzine's Euro RTM trading increased, the Board became increasingly

concerned about the Company's Euro RTM exposure.  At the January 27, 2011 meeting of the

Audit and Risk Committees, the Board directed that no additional Euro RTM transactions be

placed unless Corzine sought the Board's approval on additional positions.

83.    Soon after Stockman replaced Roseman as the new CRO, Corzine and Abelow

asked Stockman to prepare a request for consideration at the Board's March 2, 2011 meeting to

increase the European sovereign risk limit from $4.75 billion to $5 billion and to request a

temporary increase to $5.8 billion until March 31, 2011. The Board approved the requested

permanent and temporary risk limit increases but directed that management seek advance

approval from the Board or the Executive Committee if it wanted to exceed the new limits set or

significantly add to the positions beyond the scheduled maturity dates of existing positions.

Because Defendants failed to implement adequate risk controls to monitor liquidity risks, as

discussed in more detail above, any approval by the Board to increase sovereign risk limits was

not a fully informed decision based on complete and accurate information.

84.     Only three weeks after the March 2, 2011 Board meeting, during a March 23,

2011 meeting of the Executive Committee, Corzine again sought to expand the risk limits,

requesting an extension of the temporary increase in the overall limit of $5.8 billion through

September 30, 2011.

85.     On March 18, 2011, Stockman expressed to Abelow his discomfort at the

frequency of Corzine's risk limit increase requests.

86.     The Executive Committee approved Corzine's request to extend the temporary

$5.8 billion limit until September 2011, at which time the limit was scheduled to revert to $5

billion, provided that the maturities of the positions did not extend beyond December 2012. The

Executive Committee also approved an increase in the Italian sovereign limit — within the

overall European sovereign limit — from $1.8 to $3.1 billion; at the March 2 Board meeting, the

Italian limit already had been increased from $1.5 to $1.8 billion. In March 2011, Corzine

placed $2.94 billion in Italian sovereign RTM trades, thereby exceeding the Board's limit.

Again, these approvals were not fully-informed based on the true liquidity risks.

87.     On March 31, 2011, only eight days after the March 23 Executive Committee

meeting, Corzine again sought the Board's approval to increase the Belgian limit from $500

million to $1 billion.  This request was above and beyond the $5.8 billion limit only recently

established for Ireland, Portugal, Spain, and Italy.  One day before Corzine's March 31, 2011

request, Abelow expressed to Stockman his surprise that Corzine would seek an increase in the

Belgian limit.

### 2.    The Euro RTM Strategy Created Increasing Liquidity Demands

88.    As Corzine continued to seek increases in the risk limits in Euro RTM positions,

the demands for margin funding also increased, and the Company needed to find new means of

satisfying margin demands.

89.    Stockman highlighted the potential increases in margin demands resulting from

the Euro RTM strategy during his presentation at the May 11, 2011 Board meeting.  He indicated

a total margin funding need between March 1 and May 5, 2011, of $167 million — up from $105

million — and noted that the LCH had increased the initial margin, or "haircut," for Portugal to

45%, or $500 million.  MF Global was only able to avoid posting this increased margin by

transferring the positions to another clearinghouse, Eurex.

90.    In order to free up more liquidity to further increase the Company's level of Euro

RTM positions, starting at the end of May 2011, Corzine caused the Company to enter into short

Euro RTM positions (called "reverse repos-to-maturity," or "RRTMs").  The RRTMs had the

effect of reducing the Company's net Euro RTM positions and the margin demands on these

positions and enabled Corzine to take gross long positions in excess of the net risk limits set by

the Board (limits that were not the result of fully-informed decisions).  These gross long Euro

RTM positions ultimately reached $12.5 billion in or about the end of July 2011.  In early June

2011, Corzine requested yet another increase in the European sovereign risk limit, based on

potential returns on the investments, and the Board put further checks on his trading.  Abelow

recognized that Corzine's proposed Euro RTM risk limit increase would stress liquidity, and specifically discussed these dangers with Corzine the day before the June 6 Board meeting.

91.      As of the day of the June 6 Board meeting, Defendants also were aware of another potential threat to the Company's liquidity:  the fact that the Company's long positions had a much longer duration than the offsetting short positions, the RRTMs.  This presented the risk of increased margin demands and pressure on the Company's liquidity because, when the short hedges matured, they would no longer offset the margin demands on the long positions.  On the morning of June 6, 2011, Stockman warned Corzine that his intended request for an increase in the risk limit would increase the balance sheet, and that while short Euro RTM positions would reduce net exposure, they would not reduce liquidity stress, as the hedges were of shorter duration than the long positions.

92.      In an email that same day, Steenkamp explained to Corzine and Abelow, among others, the impact on these hedges of a downgrade in the Company's rating to below investment grade:

> [T]here could be an impact on the reverse RTM netting trades as these are to different maturities than the original RTMs.  The potential issue is whether some counterparties will choose not to roll over transactions or the trading counterpart can't trade with us due to our rating.  If this were to happen, then [MFGI] could lose its netting benefit on these reverses and thus be subject to higher margins, thereby increasing liquidity needs for the [B/D].

93.      In the same email, Steenkamp also stated that if the Company was unable to roll netting trades for certain Irish and Portuguese positions, then the Company might need an additional $313 million in liquidity, which could require a drawdown on the Company's RCFs.  Notwithstanding these warnings from Abelow, Steenkamp and Stockman, at the June 6, 2011 Board meeting Corzine requested an overall $1 billion risk limit increase and Steenkamp assured the Board that the Company had adequate sources of liquidity to finance the increasing positions

under severe stress conditions.  The Board did not accept Corzine's proposal, and instead

approved limit increases for higher-quality sovereigns, and lower limit increases for lower-

quality sovereigns, and imposed a June 30, 2012 maturity date limit for the lower-quality

sovereigns.

94.      At the time of the June 6, 2011 Board meeting, the initial and variation margin

requirements for the Company's Euro RTM positions amounted to approximately $200 million,

and an anticipated additional $50 million was required for positions added after the limit

increases.  Under the Risk Department's risk scenarios, potential funding requirements increased

substantially as a result of Corzine's proposed increased limits.

95.      During the June 6 Board meeting, Steenkamp assured the Board that the

Company would have the ability to finance even the most severe stress scenario presented by the

Risk Department (which lacked the information necessary to perform adequate stress tests), even

though he knew the potential impact on liquidity of a downgrade in the Company's rating.

Indeed, a little more than four months later, after the portfolio continued to increase in size, the

Company was no longer able to satisfy the liquidity needs presented by the stress scenarios.

96.      In the summer and fall of 2011, the value of MF Global's Euro RTM positions

deteriorated as the European sovereigns were downgraded.  As a result, the Company received

several large margin calls requiring the Company to post additional variation margin.  These

margin calls included the following:

- On July 14, 2011, a $150 million margin call on Portuguese positions;

- On September 6, 2011, a $33 million margin call on Italian positions;

- On September 13, 2011, a $28 million call on Italian positions; and

- On September 20, 2011, a $20 million margin call on Italian and Portuguese positions.

97.     Between September 29 and October 3, 2011, Societe Generale, a European bank, stopped providing financing for the Company's Euro RTM portfolio.  To cover a $440 million financing shortfall, the Company drew on the unsecured RCF.

98.     In late October 2011, the clearinghouses on the opposite side of MF Global's Euro RTM trades required even more margin after the Company's credit rating was downgraded.

99.     Overall, margin requirements increased dramatically between March and August 2011.

- On March 2, 2011, the total funding requirement for the Euro RTM portfolio was approximately $105 million;

- By May 5, 2011, the funding requirement jumped to $167 million;

- Only one month later, by June 6, 2011, the funding need increased to $200 million with an anticipated additional $50 million associated with the increase in risk limits sought by Corzine from the Board of Directors;

- By July 17, 2011, the funding requirement for the Euro RTM portfolio reached $450 million;

- On July 20, 2011, the funding requirement was $480 million;

- By July 29, 2011, the funding requirement reached $592 million; and

- At the August 11, 2011 meeting of the Board of Directors, Stockman reported a $500 million funding requirement, a more than a threefold increase since May 5, 2011, and almost a fivefold increase since March 2, 2011.

100.    In approximately the same time period between March and August 2011, even the inadequate analyses conducted by the Risk Department indicated similarly escalating potential margin exposure under various stress scenarios.  For instance:

- On March 2, 2011, Stockman projected potential margin calls between $297 and $761 million, with 15% additional margin projections for the temporary increase of the portfolio to $5.8 billion;

- By May 5, 2011, the projected margin demands associated with one of the two stress scenarios developed by the Risk Department had increased by $34 million;

- By June 6, 2011, potential funding needs had grown from $331 million to $500 million, and from $664 million to $1 billion under the two stress scenarios;

- By July 13, 2011, Risk Department scenarios showed potential funding requirements for the Euro RTM positions of between $988 million and $1.6 billion, exceeding, for the first time, the limits of the Company's unsecured RCF;

- By July 21, 2011, the projected margin funding requirements under the various stress scenarios developed by the Risk Department were between $1.1 billion and $1.8 billion, a substantial increase from the previous week, exceeding the combined limits of both of the Company's RCFs; and

- As of August 8, 2011, potential funding exposure on the portfolio ranged between $746 million and $1.43 billion under two of the Risk Department's stress scenarios.

Thus, between May 5 and August 8, 2011, potential funding needs associated with the

Euro RTM portfolio had doubled under the rudimentary stress scenarios from $331

million to $746 million and from $665 million to $1.43 billion, respectively.  Moreover,

by July 21, the potential funding requirements exceeded the limits of the Company's

RCFs.

> **3.      Corzine Ignored Limits Placed on His Authority by the Board and
> Disregarded the Chief Risk Officer's Recommendations and Warnings.**

101.    Corzine exceeded the Board-approved limits for European sovereign investments

on a number of occasions, including at least the following (limits that were set without a fully-

informed picture of the true liquidity risks the Company was facing):

- On October 1, 2010, Corzine caused the Company to exceed the Irish and
  Spanish limits.  The Irish breach amounted to $79 million, or 16% of the
  country limit.  This was shortly after the Executive Committee approved
  limit increases at the September 22, 2010 meeting;

- At the end of November 2010, Corzine caused the Company to exceed the
  Italian limit by $50 million;

- On March 31, 2011, Corzine caused the Company to exceed the overall
  European portfolio limit by $184 million; and

- In April and May of 2011, Corzine caused the Company to exceed the
  Italian limit by about $400 million, and the Spanish limit by
  approximately $200 million.

102.    Corzine also exceeded the gross risk limits — the combination of long and short

positions — set by the Risk Department.  For instance, on February 3, 2011, the Company

breached the Spanish gross limit of $1.75 billion by approximately 10%.  On July 6, 2011, there

was an approximately $1.3 billion breach of the Italian gross limit, an approximately $1 billion breach of the Spanish gross limit, and more than $1 billion breach of the Tier 1 (Belgium, Italy, and Spain) gross limit. On July 29, 2011, there continued to be an approximately $1 billion breach of the Italian gross limit, more than a $500 million breach of the Spanish gross limit, and more than $600 million breach of the Tier 1 gross limit.

103.    As the European credit market further deteriorated over the summer of 2011, Stockman believed that it would be prudent for the Company to mitigate the increased risks associated with its European sovereign debt trading position and to consider entering into additional hedging transactions to reduce the Company's exposure. Stockman convened two meetings, on July 13 and 21, 2011, with Corzine, Abelow (who attended only the second of those meetings), Steenkamp, and other Company managers, to discuss the risks and exposures of the Euro RTMs, stress scenarios, and the possibility of hedging the positions.

104.    During those meetings, Stockman highlighted a number of risks associated with the Euro RTM positions, including the risk of being unable to extend or replace maturing short positions in Italian or Spanish bonds, the need to rectify breaches of the risk limits, and the need to engage in additional hedging and risk-reducing strategies. In response to these warnings from the Company's CRO, Corzine challenged Stockman's analysis and dismissed the Risk Department's scenarios as unrealistic. Given the lack of internal controls at the Company, Corzine lacked sufficient material information to dismiss readily these scenarios as unrealistic.

105.    At the time of the July 13, 2011 meeting, stress scenarios created by the Risk Department showed potential funding requirements for the Euro RTM positions of between $988 million and $1.6 billion. These potential funding requirements had increased from between $542 million and $1.1 billion under prior Risk Department stress scenarios.

43

106.    Following the July 13, 2011 meeting, Stockman recommended longer-dated hedging of the Italian and Spanish bonds and a reduction in the Company's approximately $3 billion concentration in Italian bonds set to mature on December 31, 2012.  Stockman also reiterated that margin calls remained the main risk associated with these positions.

107.    Defendants failed to follow Stockman's advice to enter into longer-dated hedges or meaningfully reduce the Company's concentration in Italian bonds.

108.    In a July 17, 2011 email to all three Defendants, Stockman recommended that the trading desk and the Treasury and Finance Departments develop contingency plans in the event of significantly increased margins on the Euro RTM positions.  Stockman also stated in the email that the funding requirement for the portfolio as of the July 13 meeting had been $450 million.

109.    Stockman called a second meeting on July 21, 2011, during which he reported Euro RTM funding requirements of $480 million – which was a $30 million increase in a span of just eight days.  Stockman also revised his assessment of the projected margin funding requirements under the various stress scenarios to between $1.1 billion and $1.8 billion, a substantial increase from his assessment of eight days earlier.  Consistent with his warnings at the time of the June 6, 2011 Board meeting, Stockman warned that MFGI might be unable to replace RRTMs that were maturing and that, if MFGI no longer had the RRTM positions, it faced the risk of initial margins increasing from $248 million on each maturity date to a peak of $860 million on September 28, 2011.

110.    Despite Stockman's warnings throughout the summer of 2011, and despite Defendants' awareness of the increased liquidity risks posed by the Euro RTM strategy, Defendants failed to reduce the Company's exposure through hedging or otherwise.

111.    Instead of reducing the Company's risks in the face of these warnings, Defendants proceeded on their path and further increased the Company's exposure.  On July 30, 2011, Stockman sent an email to Corzine, copying Abelow, stating that he had noticed Corzine had caused the Company to purchase an additional $200 million in Italian Euro RTMs on the previous two days.  Stockman stated he was "not currently supportive of buying more sovereigns."  At the time, the Risk Department's updated stress scenarios showed incremental liquidity needs for these positions of $250 million and $1 billion, in addition to the already posted margin of $600 million.  Stockman recommended to Corzine and Abelow that the Company stop buying Euro RTMs until it could assess how to proactively manage initial margins.  Stockman continued to advocate setting long-dated hedges to reduce sovereign and funding risk.

112.    On August 3, 2011, Abelow requested information from the Risk Department about one of the liquidity stress scenarios for the Euro RTM portfolio.  In response, Stockman told Abelow that the Company now projected a $1.6 billion potential funding requirement, $1 billion more than previously projected under one of the stress scenarios.  Stockman said that if the Company could not find counterparties for its RRTM margin netting transactions for Italian and Spanish bonds, the Company could be required to provide an additional $250 million, for a total funding need closer to $2 billion.

### 4.    The Board Halted Further Euro RTM Trading

113.    At an August 11, 2011 Board meeting, the Board halted further growth of the Euro RTM portfolio, and expressly prohibited Corzine from using previously-approved but unutilized risk limits.  At that meeting, attended by all Defendants, management again claimed that the Company had a strong liquidity position and sufficient liquidity through its RCF and

other sources to manage even the most severe liquidity stress scenarios presented by Stockman.

Such claims by the Defendants would continue until just before the Company's demise.

Defendants were grossly negligent and reckless in making these representations because, given

the lack of controls at the Company, the information needed to make that representation

accurately for an informed decision was lacking.

114.    As of August 8, 2011, the Risk Department's stress scenarios forecasted a

potential $1.43 billion funding requirement based upon growing concerns about global economic

conditions.  This amount was in excess of the total liquidity available under the Company's

secured and unsecured RCFs.  This total funding need under the stress scenarios was more than

twice the scenarios presented in May 2011.

115.    At all times between December 2010 and October 2011, while the Company's

European sovereign risk limits were increased, Abelow was the direct supervisor of the CRO and

was substantively involved in European sovereign risk limit discussions.  Stockman kept Abelow

informed about various market developments, Board member inquiries and interactions, liquidity

risk scenarios (based on incomplete and inaccurate information), and interactions with Corzine

regarding the Euro RTM strategy.  Also, as the Risk Department developed stress scenarios for

the Euro RTM portfolio, Abelow regularly met with Stockman to discuss the scenarios.  Abelow

also was aware of Stockman's hedging advice in or about July 2011.

116.    According to the Company's own analysis, as of September 30, 2011, the

Company's Euro RTM holdings constituted 460% of the Company's equity and 13.9% of its

quarter-end assets – levels that were greatly disproportionate to the levels of other larger and

better-capitalized institutions.

F.    **The HTM Portfolio and "Box" Securities Challenged the Company's Ability to Properly Manage Its Liquidity.**

117.    Before its collapse in October 2011, the Company was deluged by increasing margin demands resulting from the Company's Euro RTM positions and additional capital charges required of MFGI by regulatory agencies.  The Company's ability to safely manage its liquidity was further threatened by the addition of new trading desks that dealt in securities that were difficult to finance and increased risk-taking in its hold-to-maturity ("HTM") portfolio.

118.    The level of securities held that could not be financed, referred to as securities held in "the box," dramatically increased in the three months preceding the Company's collapse in October 2011.  During this period, Defendant Corzine focused on trying to find ways to maintain the positions despite the growing pressure the box securities were putting on the Company's liquidity.

119.    Corzine also increased the Company's liquidity risk by investing in certain corporate securities in the HTM portfolio.  Corzine was personally involved in selecting investments for the HTM portfolio.  In 2011, MFGI's primary regulator, the Chicago Mercantile Exchange, Inc., conducted a financial and compliance examination of MFGI's January 31, 2011 segregated and secured customer fund reporting, and concluded that the Company had invested customer segregated funds in certain investments that were not in compliance with applicable CFTC Regulation 1.25 because they were not readily marketable or highly liquid and did not satisfy the regulatory rating requirement.  When the corporate securities became ineligible for investment of customer funds, the Company needed to find adequate funding for these securities from third parties.

120.    An increase in the HTM portfolio's size during the period just before the Company's collapse in October 2011, from about $6 billion in assets at the beginning of June

47

2011, to about $8.6 billion by October 3, 2011, also contributed to the Company's liquidity

challenges, since MF Global primarily funded the HTM portfolio holdings through repos, which

required additional liquidity to fund the unfinanced portion.

G.    **Defendants Failed to Respond to the Company's Liquidity and Capital Challenges
      Long Before Its Collapse in October 2011.**

121.    Defendants were on notice and knew of the many risks, especially to liquidity,

inherent in the Company's business and investment strategy and were aware of the gaps and

inadequacies in the Company's control environment.  Defendants were aware of the increased

liquidity risks that could result from, among other things, the Euro RTM-related margin calls, the

proprietary positions, and the size of the unfunded box.  Nevertheless, Defendants did little or

nothing to strengthen the Company's controls and ability to mitigate significant risks and ensure

that complete and accurate information concerning those risks was available so that informed

decisions could be made concerning the future direction of the Company.

122.    Corzine and Steenkamp were aware proprietary trading placing increased pressure

on the Company's capital resources.  They received Capital Risk Incident Escalation Reports,

which indicated decreasing levels of surplus capital, almost daily in July and August 2011.

Those reports informed Corzine and Steenkamp that the fixed income, equity, PSG, and asset-

backed securities and mortgage-backed securities desks were extensive users of the Company's

capital and sometimes dramatically exceeded their assigned capital limits.  For instance:

- On August 25, 2011, a Capital Risk Incident Escalation Report indicated
  that the Fixed Income proprietary trading desk was using $214.2 million
  of capital against a $75 million limit, while the equity proprietary trading
  desk was using $27 million in capital against a $10 million limit; and

- On July 13, 2011, the equity trading desk was using $23.1 million against a $10 million limit. By August 10, 2011, the equity trading desk's capital usage reached $27.8 Million against the same $10 million limit. On August 26, 2011, the equity trading desk's capital usage was still in breach of the internally assigned limit, at $25.2 million.

123. Defendants failed to implement a system to monitor capital limit utilization or breaches in real time.

**H.    Defendants Made Intra-Company Transfers and Took Other Actions to Fill the Liquidity Gaps, Including Using Customer Funds, While Failing to Obtain the Accurate and Reliable Information Necessary to Run the Business.**

124.    As the Defendants' activities placed ever-increasing demands on liquidity, Defendants engaged in a perpetual search for sources of liquidity to meet the Company's needs without adequate systems.

**1.    Use of Debt Offerings to Meet Demands of Regulators**

125.    Defendants' pursuit of their Euro RTM strategy and resulting outsized exposure attracted the attention of one of MFGI's regulators, FINRA, in May 2011. Shortly after learning of the Company's large European sovereign debt exposure, FINRA also learned that the Company was not reserving any capital for these trades. In August 2011, FINRA, with the support of the U.S. Securities and Exchange Commission ("SEC"), required MFGI to take a $255 million capital charge on the Euro RTMs.

126.    When FINRA and the SEC notified MF Global that the new capital charge applied retroactively, MFGI became undercapitalized by $150.6 million as of July 31, 2011. The retroactive charge required the Company to file net capital deficiency notices with two of its

regulators, the SEC and the CFTC, for the prior period and to restate its filed regulatory reports for the prior period.

127.    MFGI satisfied FINRA's capital demand through part of the $650 million in capital that the Company had just raised through two public debt offerings in August 2011. Close to $400 million of the public debt raise proceeds was used to satisfy FINRA's capital demand, to cover margin on the positions transferred from MFGI to an unregulated affiliate, MFG Special Investor, LLC ("Special Investor") in order to relieve some of the capital pressure experienced by MFGI, and to provide a loan to MFGI for its general liquidity needs.  Thus, after raising $650 million, the Company continued to maintain very little cash on hand and increasingly relied on the FCM to fund the activities of the B/D.

### 2.    Intraday Transfers

128.    For at least a year prior to the Company's collapse and the Debtors' bankruptcy, the FCM provided cash to the B/D through intraday transfers, often in amounts of between $50 and $100 million.  At times between July and October 2011, these intraday transfers were not paid back at the end of the day, causing the B/D's loan from the FCM to roll over.

129.    Due to its lack of adequate information systems, controls and procedures, the Company was unable to identify the specific areas or trades that were driving the need for these intraday transfers, and so the Treasury Department had to approve intraday transfer requests from the B/D without adequate information.  The lack of systems also limited the Company's ability to project its funding needs.  The Company had no formal process or documentation in place for approval of transfers from the FCM to the B/D.

### 3.    Use of Customer Funds in Violation of Company Policy

130.    As a regulated FCM, MFGI was required by law to have enough funds in customer segregated accounts at all times to satisfy the FCM's financial obligations to all of its customers who entrust the FCM with funds for purposes of trading on U.S. futures exchanges, referred to as "segregated customer funds." MFGI also was required by law to have a certain minimum amount of funds held in separate accounts to satisfy a portion of the FCM's financial obligations to its foreign futures customers. Amounts contained in such separate accounts are referred to as "secured customer funds."

131.    While MFGI was permitted by regulation to maintain secured customer funds equal to the amount measured by the so-called "Alternative Method," MF Global had adopted a policy to maintain a higher amount of secured customer funds as measured by the "Dollar-for-Dollar Method." The difference between the amounts calculated by these two methods was called the "Regulatory Excess," and MF Global's policy required it to maintain the Regulatory Excess as a buffer against violation of the legal requirements related to the segregated and secured customer funds.

132.    In or about July 2011, at Corzine's request, Steenkamp began to seek additional sources of funds – including loans from the FCM – to finance the B/D's trading that included proprietary and Euro RTM trading. At the time, the FCM's excess funds had eroded from approximately $150 million to $75 million. During a telephone conference in late July 2011, which included Serwinski, the CFO of MFGI, among its participants, Steenkamp indicated that there was a proposal to utilize unused segregated funds to support the B/D.

133.    When Steenkamp suggested to Serwinski that the Company was considering using funds of FCM customers (i.e., the Regulatory Excess), Serwinski expressed strong

concerns that using those customer funds for investments would be putting the FCM client assets

at risk, "even if for overnight," and emphasized that the FCM client asset base "should not be a

[B/D] working capital source strategy to be relied upon."  Serwinski made it clear to Steenkamp

that she "professionally [did] not agree with the concept of using FCM customer funds to

provide liquidity to the House [B/D] investment and trading."

134.    Notwithstanding Serwinski's expressly stated concerns, Corzine continued

pushing the Company to maximize the FCM's funds that could be used by the B/D on a short-

term basis to satisfy the Company's liquidity needs.  Steenkamp reported on or about August 3,

2011, that, even though Corzine understood the regulatory lock-up requirement,

> as part of overall liquidity management, [Corzine] would like to
> know how we can use all surplus daily (even if only $50m),
> maximize it through daily liquidity management and also use other
> securities to fund the lock-up.  He also understands using other
> securities would have a cost, but is looking for this group to come
> to him with solutions/options, and also accompanying costs.

135.    Corzine and Steenkamp continued to promote the potential use of customer funds

to meet the Company's growing liquidity pressures in the summer of 2011, directing the Finance

and Treasury Departments, through Steenkamp, to "maximize" the use of any daily surplus of

customer funds.

136.    An August 10, 2011 email written by Assistant Treasurer O'Brien indicated that

Steenkamp failed to acknowledge the precarious liquidity position of the Company:

> Henri [Steenkamp] says to me today "…we have plenty of cash." I
> was rendered speechless – and wanted to say "Really, then why is
> it I need to spend hours every day shuffling cash and loans from
> entity to entity?"  Shell game . . . .

137.    In September 2011, Steenkamp again showed his willingness to rely on

segregated customer funds, this time to portray the Company's financial condition in a favorable

light.  During the prior month, Abelow had provided liquidity figures to the United Kingdom's

Financial Services Authority ("FSA") showing that the Company had cash available of $410 million, and that MFGI had available cash of $165 million. When the FSA requested updated liquidity numbers in mid-September, Treasury Department employees discovered that, in less than a month, the Company's available cash had dropped from $410 million to $238 million, and MFGI's available cash had dropped from $165 million to $25 million.

138.    When the Company provided the updated liquidity figures to the FSA, Steenkamp approved the inclusion of an additional $300 million from the FCM segregated fund liquidity pool. Despite the fact that segregated funds had not been included in the August report, the Company represented that the September report was "in the same format."

139.    To ease the capital and liquidity pressures experienced by the Company over the summer of 2011 both before and after the imposition of FINRA's net capital charge, Abelow and Steenkamp initiated several belated actions to decrease regulatory capital requirements, including: (1) the transfer of most of PSG's positions to Special Investor; (2) the transfer of some Euro RTM positions from MFGI to FinCo; and (3) the sale of the Company's London and Asia Pacific affiliate clearing business to the Bank of New York ("BONY"). Abelow was responsible for accelerating the sale of the affiliate business to BONY.

140.    Corzine wanted to avoid using the RCF to pay margin demands in order to mask the fact that the Company was in financial trouble. On October 6, 2011, he told an MF Global Treasury Department employee that they were going to do all the things they could not to draw on the RCF, even if it meant "go[ing] negative" in the FCM customer accounts. Corzine knew that "going negative" in the FCM customer accounts, that is, using Regulatory Excess, would be a violation of firm policy.

141.    Also on October 6, 2011, the Global Treasurer told the CFO of Holdings Ltd. and another MF Global employee that he had told Corzine that the Company's liquidity situation was "not sustainable" and that the "situation is grave."  During this conversation – which was recorded – the Global Treasurer stated that "we have to tell [Corzine] that enough is enough.  We need to take the keys away from him."

142.    On October 7, 2011, Corzine again considered using customer funds (i.e., the Regulatory Excess) in violation of firm policy.  In a recorded conversation with another MF Global employee, Corzine stated:  "We need to go through what that real number is at the FCM. You know, what's the drop dead amount. . . .  You know, I'm sure there is a buffer in her thinking.  We've got to find out what that is so that we have some ability to think about pulling it if we have to."

143.    On at least the following days, Defendants permitted the Company to violate its policy by using its Regulatory Excess:

- On October 14, 2011, the Company used approximately $70 million more of FCM funds than permitted pursuant to Company policy;

- On October 17, 2011, the Company used $16 million more of FCM funds than permitted pursuant to Company policy; and

- On October 19, 2011, the Company used $55 million more of FCM funds than permitted pursuant to Company policy.

144.    Defendants failed to inform the Board about the B/D's reliance on FCM funds, the B/D's actual growing use of those funds through intraday loans from the FCM, the gravity of the liquidity situation, and the above violations of Company policy.

54

**I.      Defendants Failed to Engage in Timely and Meaningful Contingency Planning.**

145.      Despite months of repeated warnings and reports of liquidity stresses from several departments, Defendants failed to engage in any meaningful contingency planning.  Instead, in August and September 2011, they authorized an analysis by subordinates that reached conclusions – and reported them to the Board – which they knew were overly optimistic and/or lacked sufficient material information as a result of the lack of controls at the Company.

146.      In or around August 2011, several Board members directed Defendants to prepare an analysis of the potential impact of a downgrade of the Company's credit rating under various scenarios.  This analysis ultimately was dubbed "Break the Glass."  Defendants directed, reviewed, edited, and ultimately approved the "Break the Glass" analysis for distribution to the Board.

147.      Defendants' Break the Glass analysis concluded that the Company would survive at least one month, even in the most "severe stress event."  Contrary to that conclusion, the worst-case scenario unfolded in the span of only a few days, as discussed below.  The disconnect between what was reported in the Break the Glass analysis and what happened just a few days later demonstrates the lack of informed decisions based on the inadequate systems.

148.      Defendants had little confidence in their Break the Glass scenario, but issued it to the Board of Directors anyway.  For example, during the process of drafting the Break the Glass analysis, Abelow expressed doubt about its conclusions.  In an October 10, 2011 email to Steenkamp, Abelow declared:

> **I [do not] have any real confidence at this point that we know our liquidity in each of days 1-7 in event of a stress event.**  This is troubling as we need to provide an answer to [the] board and [Corzine] and I need to know so that we can assess if there are steps we need to take over [the] next several weeks.

(Emphasis added.)

55

149.     In response to Abelow's email, Steenkamp shared Abelow's concern:

> I felt the same way in reading through this, Brad.  It felt like a good story at each milestone (day 0, day 7, day 30), but that assumes we get there.

150.     Despite their stated concerns about the Company's ability to forecast its liquidity, neither Abelow nor Steenkamp took steps to address the issue.  The Break the Glass analysis, even if it could have possibly provided a complete and accurate picture of liquidity needs and other issues given the Company's lack of controls, was issued long after the Defendants had continually and repeated breached their fiduciary duties that sealed the Company's fate.

151.     On or about October 5, 2011, at around the same time that Company employees were working on the Break the Glass Analysis, Corzine directed the Company's Global Treasurer, Vinay Mahajan ("Mahajan"), who had just joined the Company in mid-August, to engage in a separate project to address immediate liquidity needs.  Specifically, Corzine asked Mahajan to:

- Locate funding for the Company's corporate portfolio in the event that the secured financing desk was unable to finance those investments through repurchase transactions;

- Identify positions in the box that could be sold to generate liquidity; and

- Build a global liquidity buffer by preparing for a draw on the RCF to support the Company's corporate portfolio.

152.     On or about October 6, 2011, Mahajan informed Abelow and Steenkamp of the following major increased stresses to the Company's liquidity:

- A $30 million increase in the Company's box position;

- $82 million in haircuts associated with the fixed income business;

- Breaches of regulatory capital limits by the fixed income and the asset-backed securities trading desks; and

- A liquidity drain caused by corporate and asset-backed and mortgage-backed securities positions.

Mahajan reported that the sole remaining cash pool was $80 million used by the FCM to finance client activity.

153.    Steenkamp outlined the Company's liquidity problems in an October 6, 2011 email to Corzine, Abelow and others:

> There remains a significant stress on liquidity. . . .  Of most concern, is the sustained levels of stress and the lack of signs this will reduce soon.  It makes drawdowns of the [RCF] more challenging, as we cannot guarantee certainty of immediate repayment.  The [RCF] is not meant as a source of permanent liquidity.
>
> TODAY, TOMORROW −
>
> Haircuts and box positions today have continued to increase and were fortunately offset by FCM increases (that is not controllable).  However, liquidity remains under $100m with the expectation for this to drop tomorrow as repo sources (rebalancing) are reduced. . . .
>
> THE FUTURE −
>
> However, Jon, more worrying is we need to address the sustained stress. In summary, we have three pools of liquidity for [MFGI]- (1) [FinCo] cash which is real and permanent, (2) FCM excess cash which is temporary and volatile, as depends on how customers post margin, and (3) the situation of our broker-dealer that is currently unable to fund itself, and more worrying continues to need more cash than we have in [FinCo], thereby having us dip into FCM excess every day.  This should be temporary but is becoming permanent, and the FCM cash is not reliable.  Why is [the B/D] unable to fund itself?  Part of it is the permanent pool of liquidity needed for RTM's, but we also see continued haircut increases in fixed income, increased funding needed for PSG and box size being permanently large. . . .  [T]his

continued liquidity stress is not sustainable without either more
permanent (not temp) liquidity, or mitigating steps taken.

154.    This email highlighted liquidity problems that MF Global was facing, including:

- The inability to rely on the RCF as a source of liquidity;

- Increased funding needed for PSG and the growing size of the box;

- The temporary and volatile nature of FCM cash that made it an

  inappropriate source of sustained funding;

- Shrinking cash available for liquidity funding; and

- The inability of the B/D to fund itself.

155.    During the following two weeks, Defendants became aware of the following "red

flags" that confirmed the precarious financial situation of the Company:

- On October 11, 2011, Abelow and Steenkamp learned that the B/D was

  using up $210 million of FinCo's $226 million liquidity pool;

- On October 13, 2011, Abelow and Steenkamp learned that FinCo's $233

  million balance had been completely used up by the B/D, which was

  already borrowing $34 million from the FCM;

- By October 14, 2011, Abelow and Steenkamp learned that the B/D was

  using $318 million from a combination of FinCo ($249 million), the FCM

  balance ($53 million), and the FCM buffer ($16 million), which consisted

  of funds held by the Company in customer accounts in excess of certain

  regulatory requirements;

- On October 14, 2011, Steenkamp described the Company's liquidity to

  Corzine as "very tight;" and

- On October 17, 2011, Steenkamp informed Corzine and Abelow that, instead of ending the day with positive amounts of cash, the Company had actually ended the day with negative $16 million.  Due to a regulatory requirement that MFGI lock up $19 million to meet potential customer demands, the Company had negative $35 million to start the following day.

156.    An October 17, 2011 analysis of the key drains on the Company's liquidity between June 30 and October 14, which was provided to Defendants, indicated that, in less than four months, the margin requirements associated with the Euro RTM positions had increased from $248 to $427 million, while the box collateral had gone from zero to $126 million.  The Company experienced further liquidity stresses from the additional haircuts paid to finance its portfolio of corporate bonds.

**J.     As the Company Descended Towards Chapter 11, Defendants Continued to Trumpet the Company's Liquidity and Improperly Used Customer Funds.**

157.    As of October 17, 2011, MF Global's liquidity was severely depleted.  Since the end of June 2011, the Company went from having excess cash and fully-paid securities of $149 million to needing $318 million in cash.  That increased funding need was due in part to the increase in Euro RTM margin calls and in part to the funding needed to finance the securities in the box, a funding requirement that had not existed on June 30, 2011.

158.    An October 17, 2011 article in The Wall Street Journal entitled "MF Global Told to Boost Capital" reported FINRA's regulatory capital charge as follows:  "Regulators ordered MF Global Holdings Ltd., the brokerage firm led by former New Jersey Gov. Jon Corzine, to boost its net capital in August after they grew concerned about its exposure to European debt."

159.    On October 24, 2011, Moody's Investors Service ("Moody's") downgraded MF Global to one notch above "junk" status, with a negative watch rating, strongly suggesting that Moody's was planning on a further downgrade.  Moody's rating downgrade was based on its belief that (a) the Company would announce lower than expected earnings; and (b) the current low interest rate environment and volatile capital markets made it unlikely that MF Global would be able to meet, in the short term, the financial targets that Moody's had set in February 2011 for the Company to maintain a Baa2 rating.  These targets included generating $200 to $300 million in annual pre-tax earnings and maintaining the liquidity and risk management discipline necessary as the Company executed its B/D strategy.

160.    Moody's stated that it had become increasingly concerned about MF Global's management of its risks and its management's ability to prudently balance risk and reward as the Company underwent a substantial re-engineering.  Moody's also stated that:

> MF Global's increased exposure to European sovereign debt in peripheral countries and its need to inject capital into its [B/D] subsidiary to rectify a regulatory capital shortfall highlights the [Company's] increased risk appetite and raises questions about the [Company's] risk governance.

161.    On October 25, 2011, the Company announced its results for its second fiscal quarter ended September 30, 2011, posting a $191.6 million GAAP net loss, compared with a loss of $94.3 million for the same period the prior year.  The Company took a deferred tax asset write-off, which reflected the view of management that the Company would not be profitable in the near future.  The Company's stock price fell that day by almost 50%.

162.    Defendants were grossly negligent in failing to fully inform themselves about the Company's dire liquidity situation, recklessly disregarded what they were told, or just didn't care.  For example,

- On October 24, 2011, Steenkamp wrote an email to Standard & Poor's
  Rating Services ("S&P") stating, MF Global's "capital and liquidity has
  never been stronger," and "MF Global is in its strongest position ever as
  [a] public entity";

- During an October 25, 2011 earnings call, Corzine and Steenkamp
  continued to highlight what they claimed was the Company's strengthened
  liquidity and capital profile;

- Corzine represented that management had "substantially improved our
  capital and liquidity positions" and "husbanded our capital and
  strengthened our liquidity"; and

- Steenkamp also stated that "the capital market transactions this quarter
  improved [the Company's] capital and liquidity positions," its "capital
  structure has never been stronger," and that management felt "good about
  [the Company's] capital structure and liquidity position as well as the
  strategic direction and progress against the plan."

163.    On October 26, 2011, Fitch Ratings ("Fitch") downgraded the Company's stock
to one notch above investment grade.

164.    Also on October 26, 2011, S&P placed the Company under Negative Credit
Watch with Negative Implications, taking note of the Company's "very high" exposure to
European sovereign debt in relation to its capital base.

165.    Fitch and Moody's further downgraded the Company to "junk" status on October
27, 2011, because of its weakened core profitability and increased risk-taking, in the form of its

Euro RTM positions.  This was followed by an increase in margin calls against MFGI and an exodus of its customers, threatening overall liquidity.

166.    During the last week prior to the bankruptcy filings of Holdings Ltd. and FinCo, the Company's goal was to sell all the positions in the Company's portfolio to ensure that it had enough cash to make all of its required payments.  The Company engaged in a "fire sale" by sending bid lists to other Companies showing the securities that the Company was willing to sell.  However, the Company's Operations and Treasury Department systems were inadequate to meet the challenge of a speedy liquidation of the Company's assets in this short period of time.  Among other reasons, the liquidation could not be accomplished due to substandard back office systems which generated inaccurate or erroneous fail reports, the lack of a collateral management database, and the lack of an integrated global treasury system to track whether money was properly moving to the right accounts.  The Company's failure to have back office and treasury systems commensurate with the complexity of its operations exacerbated the Company's problems and prevented it from selling sufficient assets to pay the Company's debts as they came due.

167.    Defendants also failed to take advantage of opportunities to mitigate the Company's losses.  For example, on October 26, 2011, Abelow met with a representative from another B/D who offered to consider purchasing MF Global's portfolio of Euro RTMs.  When Abelow attempted to arrange a meeting between the representative and Corzine to discuss a possible transaction, Corzine refused to meet with him because he was in the process of auctioning some commercial paper, and needed to do it before the close of the London market.  Consequently, no sale of the Euro RTMs was discussed with that B/D at this time, and the Company missed an opportunity to sell its Euro RTM portfolio.

168.    During the last week prior to the bankruptcy filings of Holdings Ltd. and FinCo,

margin requirements on the Euro RTM positions increased dramatically and further stressed the

Company's liquidity.  Euro RTM margin posted at the clearinghouses increased by $211 million

to $663 million.  On October 25, 2011, MFG UK received a margin call from the LCH for 110%

margin based on the Company's downgrade by Moody's of the Company's issuer credit rating to

Baa3, which took effect on October 27, 2011.  The accelerated pace of the Euro RTM-related

margin calls coupled with other liquidity pressures experienced by the Company ultimately

caused MFGI to fail to meet the last $310 million in margin calls received on October 31, 2011.

169.    In an attempt to alleviate its liquidity pressures, on five separate instances

between October 18 and 28, 2011, the Company drew a total of $930 million on its $1.2 billion

RCF.  By October 27, the facility was almost fully drawn, with the exception of $27 million that

one of the syndicate banks refused to fund.

170.    On October 26, 2011, to satisfy the need for additional liquidity at the B/D, MFGI

transferred $615 million from the FCM.  Most, if not all, of those funds came from customer

funds, and none of those funds were returned to the FCM that day.  Even well after the end of

that business day, members of the Treasury Department did not know whether the funds

transferred actually came from customer funds, due to the Company's inability to monitor

segregated funds in real time.  In fact, on that day, the FCM had negative customer segregated

funds in violation of regulatory requirements. Treasury Department personnel also withdrew an

additional $200 million from segregated customer funds on October 28, 2011.  MFG UK had an

obligation to JPMorgan Chase ("JPM") resulting from several overdrafts, and Corzine directed

the Treasury Department to satisfy this obligation.  O'Brien arranged a $200 million wire

transfer from an MFGI customer segregated account to a Company house account, and then transferred $175 million of that amount to an MFG UK account at JPM.

171.    At the time O'Brien transferred the $200 million from segregated funds, it was unclear whether that amount was available in excess customer funds.  When JPM sought assurances that the money transferred from MFGI did not represent customer funds, O'Brien was unable to provide that assurance, at least in part because the Company's internal reports were inadequate to monitor the Company's liquidity and customer segregated funds accurately and in real time.  Treasury Department personnel subsequently learned that, as of the close of business on October 27, 2011, the Company's segregated accounts had a deficiency of over $300 million.

172.    When Financial Regulatory Group staff attempted to reconcile the deficiency, they concluded – wrongly – that the deficiency was the result of five transactions totaling $540 million that had been booked incorrectly.  To make matters worse, these Financial Regulatory Group staff members, on their own authority, manually adjusted the Company's segregation statement by $540 million without support for that adjustment, and thus wrongly reported an excess $200 million in segregated funds on reports filed with the regulators.  On the following day, when a member of the Financial Regulatory Group prepared the Segregation Statement and Secured Statement, he discovered a deficit of almost $1 billion.

173.    Early in the morning of October 31, 2011, MFGI reported a $952 million deficit in segregated funds as of the close of business on October 28.  Initially, Finance and Treasury personnel erroneously believed that the deficit was due to an accounting error.  A subsequent review by the Trustee in MFGI's SIPA liquidation determined that MFGI had a deficiency in its segregated funds as early as mid-day on October 26, 2011, in violation of regulatory requirements.

174.     The Company explored a number of strategic alternatives, including a sale of all

or parts of the business, before the Debtors went bankrupt.  On October 30, 2011, with the

Company's overall liquidity quickly diminishing to unsustainable levels, a sale to a third party

collapsed when the Company informed the would-be buyer that it had identified a potential

significant shortfall in customer segregated funds.

## COUNT I

### BREACH OF FIDUCIARY DUTY OF CARE
### BY DEFENDANTS CORZINE, ABELOW AND STEENKAMP

175.     Plaintiff repeats and realleges each and every allegation above, as if fully set forth

herein.

176.     By virtue of Defendants' positions with MF Global, a fiduciary relationship

existed between Defendants and the Company.

177.     As fiduciaries, Defendants were obligated by their duty of care to act at all times

on an informed basis and act rationally and with the highest degree of good faith.  As part of this

duty, Defendants were required, among other things, to exercise reasonable and prudent

supervision over the management, policies, practices, controls, and financial affairs of the

Company, such that they were fully informed in making their decisions.  Upon receiving notice

or information of imprudent or unsound practices, Defendants were required to make a

reasonable investigation and to correct those practices.  Defendants also were required to conduct

the affairs of the Company in an efficient, businesslike manner so as to make it possible to

maximize the profitability of the Company and to assure that business risks taken were the result

of fully-informed decisions that were reasonable under the circumstances presented.

178.     Defendants breached their fiduciary duty of care through their grossly negligent

and reckless performance of their duties, as set forth in detail above.  Among other things,

Defendants knowingly failed to establish an information and reporting system reasonably designed to provide the senior management and the board with information regarding the corporation's liquidity and regulatory compliance.  Defendants failed to inform themselves of all material information reasonably available to them prior to making decisions that resulted in the Company's financial collapse even though they knew the new strategy was a high-risk strategy. Because Defendants failed to act on an informed basis about matters crucial to the management of the Company's business, the business judgment rule does not apply to Defendants' actions and inactions as alleged herein.

179.    Moreover, Defendants' actions alleged herein were not the result of rational or good faith processes.  Among other things, Defendants acted in a grossly negligent and reckless manner by committing the Company to massive, high-risk investments in Euro RTMs to artificially inflate the company's reported revenues without informing themselves of reasonably available material information regarding liquidity; by ignoring repeated warnings about the inadequate processes and controls in place to manage the company's liquidity; by demoting and then dismissing the Chief Risk Officer for expressing concern about the significant risks the Company's Euro RTM positions presented; by exceeding the Board-approved limits for European sovereign investments on multiple occasions (and failing to present full and accurate information for the Board to set those limits); and by allowing segregated customer funds to be used to avoid the liquidity crisis Defendants' uninformed decisions created (and by failing to inform the Board they were wrongly using segregated customer funds to try and avoid a liquidity crisis).

180.    As a result of the conduct alleged herein, Defendants are liable to the Debtors and the Company.

181.     As a direct and proximate result of Defendants' breaches of their fiduciary duty of care, the Company collapsed, the Debtors commenced bankruptcy proceedings, and the Debtors and the Company sustained significant damages in an amount to be ascertained.

**COUNT II**

**BREACH OF FIDUCIARY DUTY OF LOYALTY
BY DEFENDANTS CORZINE, ABELOW AND STEENKAMP**

182.     Plaintiff repeats and realleges each and every allegation above, as if fully set forth herein.

183.     By virtue of Defendants' positions as officers of MF Global, a fiduciary relationship existed between Defendants and the Company.

184.     As fiduciaries, Defendants were obligated by their duty of loyalty to the Company to act in a manner consistent with the best interests of the Company.

185.     To comply with their duties of loyalty, Defendants were required to exercise good-faith supervision of and oversight over the management, policies, practices, controls, and financial affairs of the Company.  Upon receiving notice or information of imprudent or unsound practices, Defendants were required to make a reasonable investigation and to correct those practices.  Defendants also were required to conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to maximize the profitability of the Company and to assure that business risks taken were reasonable in relation to, among other things, the potential profit the transactions offered.  As set forth in detail above, Defendants breached their fiduciary duty of loyalty to the Company by consciously ignoring known risks to the Company's liquidity, by demoting and then dismissing Roseman as CRO for raising concerns about the known risks, by concealing the risks from the Board, by intentionally exceeding Board trading

limits, and by authorizing and sanctioning the use of customer-segregated funds to meet liquidity

needs in knowing violation of law and Company policy.

186.     Defendants also breached their duties of loyalty by putting their own desire to

keep their positions and maximize incentive compensation ahead of the best interests of the

Company.  This conflict led Defendants to take excessive risks they would not otherwise have

taken, risks that were not in the best interests of the company and that resulted in its financial

collapse and significant potential legal liability.  Among other things, Defendants used Euro

RTM investments to artificially generate revenue and conceal the Company's leverage, resulting

in materially misleading financial reports; consciously failed to improve controls and reporting

systems that would have revealed the perilous financial position of the Company; further tried to

conceal the risk by demoting and then dismissing Roseman as CRO when he raised "red flags"

about the situation; exceeded Board-approved limits for Euro RTMs on multiple occasions; and

allowed customer funds to be used to meet liquidity demands in violation of law and company

policy, exposing the Company to enormous potential liability.

187.     As a direct and proximate result of Defendants' failures to satisfy their fiduciary

duty of loyalty, the Company collapsed, the Debtors commenced bankruptcy proceedings, and

the Debtors and the Company sustained significant damages in an amount to be ascertained.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff prays for judgment:

1.     Awarding Plaintiff damages in an amount to be determined at trial;

2.     Awarding Plaintiff its attorney's fees, costs, and other expenses incurred in this

action; and

3.     Granting Plaintiff such other and further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Litigation Trustee

demands trial by jury in this action of all issues so triable.

Dated:  September 16, 2013
          New York, New York

Respectfully submitted,

/s/ *Bruce Bennett*
Bruce . Bennett
Christopher Lovrien
Michael McCauley
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, California  90071
Telephone:     (213) 489-3939
Facsimile:     (213) 243-2539

- and –

Lee Armstrong
JONES DAY
222 East 41st Street
New York, New York  10017
Telephone:     (212) 326-3939
Facsimile:     (212) 755-7306

- and –

Adam S. Hoffinger
Daniel A. Nathan
MORRISON & FOERSTER LLP
2000 Pennsylvania Ave., NW
Washington, DC 20006-1888
Telephone:     (202) 887-1500
Facsimile:     (202) 887-0763

- and –

Brett H. Miller
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, NY 10140-0050
Telephone:     (212) 468-8000
Facsimile:     (212) 468-7900

*Attorneys for the Litigation Trustee*
*of the MF Global Litigation Trust*

LAI-3199295v3

69